**AM GENERAL CORPORATION,**
**Plaintiff,**

v.

**DEPARTMENT OF TRANSPORTATION**
**et al., Defendants.**

**Civ. A. No. 76-1603.**

United States District Court,
District of Columbia.

April 21, 1977.

Eldon H. Crowell, W. Stanfield Johnson, John W. Chierichella, David K. Aylward, Washington, D. C., James F. Holden, South Bend, Ind., for plaintiff.

Earl J. Silbert, U. S. Atty., Robert N. Ford, Lawrence T. Bennett, Asst. U. S. Attys., Robert W. Batchelder, Acting Asst. Chief Counsel, UMTA, Michael S. Bates, Atty.-Advisor, UMTA, Washington, D. C., Fred H. Bartlit, Jr., Donald G. Kempf, Jr., Leslie D. Locke, Chicago, Ill., Thomas C. Arthur, Gilbert A. Cuneo, Washington, D. C., Frazer F. Hilder, Robert A. Nitschke, John W. Sibley, Detroit, Mich., for intervenor-defendant General Motors Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHARLES R. RICHEY, District Judge.

This case is before the Court for final adjudication of Counts I and II of plaintiff's Amended Complaint. This Court's jurisdiction over the matters here in controversy is provided by 28 U.S.C. § 1331(a) (federal question).

In Counts I and II, plaintiff AM General Corporation (AM General) challenges the decision of the defendant Urban Mass Transportation Administration (UMTA) to make funds available to a consortium of certain local transit agencies (the "Consortium") under a federal grant program, to facilitate the purchase of approximately 400 mass transit buses by the Consortium. Specifically, plaintiff alleges that by concurring in the specifications for buses presented by the Consortium, and by authorizing thereafter the expenditure of grant funds allegedly pursuant to the Urban Mass Transportation Act of 1964, 49 U.S.C. §§ 1601 et seq. (1970), as amended (Supp. V 1975), UMTA violated the Act's prohibition against the use of grant funds "to support procurements utilizing exclusionary or discriminatory specifications." 49 U.S.C. § 1602(a)(1). Plaintiff seeks a declaration that the specifications in question are exclusionary and discriminatory within the meaning of 49 U.S.C. § 1602(a)(1) and an injunction prohibiting defendants from "making financial assistance available or committing federal grant funds to the Consortium in support of any third-party contracts [for the purchase of mass transit buses] based upon the specifications approved by UMTA therefor." Amended Complaint at 16.

The General Motors Corporation (GM) has intervened in this case as a defendant. GM was the sole manufacturer to respond to the Consortium's invitation for bids for a contract to supply the Consortium with mass transit buses per its specifications. Federal funding of the procurement in question has been stayed pendente lite by this Court's Order of September 2, 1976.

The case came before the Court for a hearing on dispositive motions on February 3 and 4, 1977. At that time, the Court expressed doubt as to whether the case was in a posture appropriate for summary judg-

ment. With the Court's approval, the parties proceeded to present live testimony from two UMTA officials. At the end of the hearing, the parties agreed to submit the case to the Court for final, not summary, adjudication based on the arguments of counsel, the testimony taken, various exhibits and documents received by the Court, and post-hearing briefs and documents which were to be submitted by counsel. The post-hearing briefs and documents have now been filed, and the case is in a posture for final adjudication. For the reasons indicated in the following findings of fact and conclusions of law, the Court will enter judgment for the defendants on Counts I and II of the Amended Complaint.

## I. FINDINGS OF FACT

A. *Background—Parties and the Pertinent Statutory Programs.*

The following facts have been stipulated to and admitted by the parties:

1. On August 31, 1976, plaintiff AM General instituted this action for declaratory and injunctive relief against the United States Department of Transportation, the Secretary of Transportation, the United States Urban Mass Transportation Administration and the Urban Mass Transportation Administrator.

2. Plaintiff, AM General, is a corporation organized and existing under the laws of Delaware, having its principal place of business in Wayne, Michigan. Plaintiff is engaged, *inter alia,* in the design, development, and manufacture of mass transit buses, including the AM General "Metropolitan" or "B Model" bus, for use by state and local public agencies in connection with urban mass transportation systems.

3. The Secretary of the United States Department of Transportation is authorized, pursuant to the Urban Mass Transportation Act of 1964, 49 U.S.C. §§ 1601 *et seq.* (1970), *as amended* (Supp. V 1975) (the "UMT Act") and other statutes, to carry out a program of Federal financial assistance to urban mass transportation.

4. At the time AM General filed its action, William T. Coleman, Jr., was the Secretary of Transportation and was authorized to conduct all of the affairs of that Department. Brock Adams is the current Secretary of Transportation and is authorized to conduct all of the affairs of that Department.

5. At the time AM General filed its action, Robert E. Patricelli was the Urban Mass Transportation Administrator and was authorized to conduct all of the affairs of UMTA. Robert H. McManus is the current Acting Urban Mass Transportation Administrator and is authorized to conduct all of the affairs of UMTA. All of the powers and functions of the Secretary of Transportation under the UMT Act and other statutes authorizing Federal financial assistance to mass transportation have been delegated to the Urban Mass Transportation Administrator. *See* 49 C.F.R. § 1.51.

6. General Motors Corporation and Flxible Company ("Flxible") have filed motions to intervene in this action as party defendants. Those motions were granted November 9, 1976 and February 3, 1977, respectively. Flxible has intervened only for purposes of Counts III and IV of the Amended Complaint, which are not currently at issue.

7. The purposes of the federal program of financial assistance to mass transportation are:

*to assist in the development of improved mass transportation facilities, equipment, techniques, and methods, with the cooperation of mass transportation companies both public and private;* to encourage the planning and establishment of areawide urban mass transportation systems needed for economical and desirable urban development, with the cooperation of mass transportation companies both public and private; and to provide assistance to state and local governments and their instrumentalities in financing such systems, to be operated by public or private mass transportation companies as determined by local needs.

49 U.S.C. § 1601(b) (emphasis added).

8. A 1970 amendment to the UMT Act added, "[I]t is the purpose of this Act to create a partnership which permits the local community, through Federal financial assistance, to exercise the initiative necessary

to satisfy its urban mass transportation requirements." 49 U.S.C. § 1601a.

9. To accomplish the purposes of the UMT Act, section 3(a), 49 U.S.C. § 1602(a), authorizes the Secretary of Transportation to make grants to state and local public bodies to assist in the financing of mass transportation-related capital facilities and equipment including standard-size transit buses.

10. Similarly, section 5 of the UMT Act, 49 U.S.C. § 1604, establishes a formula grant program which authorizes the Secretary of Transportation to make grants to designated recipients in urbanized areas to assist in the acquisition of mass transportation-related capital facilities and equipment, including standard-size transit buses, and for operating expenses.

11. The federal share of a capital facilities or equipment grant is 80 per cent of net project cost under section 3 and a maximum of 80 per cent of net project cost under section 5; the remainder must be provided from local sources. 49 U.S.C. §§ 1602, 1603, 1604.

12. UMTA's External Operating Manual, as well as other regulations and policy directives promulgated by UMTA, set forth the manner in which grants under sections 3 and 5 of the UMT Act are to be carried out.

13. As reflected in the External Operating Manual, mass transportation grants are effected by means of two interrelated but distinct levels of contracting. The first involves a grant contract between the United States (i. e. UMTA) and the grantee (i. e. the state or local public body, or "project sponsor") setting forth the terms of the grant and the conditions imposed upon the use of grant funds. The second level involves one or more "third party contracts" executed between the project sponsor and the individual suppliers of mass transportation facilities and equipment that the grant funds will be used to acquire. External Operating Manual, Chapter II, sections B(6)(a) and (b).

14. The statutory provision that is central to this action is contained in the last sentence of section 3(a)(1) of the UMT Act, 49 U.S.C. § 1602(a)(1), which reads as follows:

> No grant or loan funds shall be used for payment of ordinary governmental or nonprofit operating expenses, *nor shall any grant or loan funds be used to support procurements utilizing exclusionary or discriminatory specifications.*

(Emphasis added.)

15. UMTA has approved capital facilities and equipment grants to assist each member of a consortium of local transit agencies (the "Consortium") to acquire standard size transit buses under section 3 or 5 of the UMT Act. The Consortium is headed by the City of Houston and comprised of the following transit agencies: Houston Transit System, San Antonio Transit System, and Dallas Transit System (Texas); Alameda Contra-Costa Transit District and Long Beach Public Transportation Company (California); and Brockton Transportation Authority (Massachusetts).

16. AM General contends that specifications formulated by the Consortium, and modified and concurred in by UMTA, in connection with the Consortium's advertisement for bids for third-party contracts to supply 365 to 418 advanced design transit buses are "exclusionary" and "discriminatory" in violation of the last sentence of section 3(a)(1) of the UMT Act.

B. *Developments In The Industry; Progress Of And Problems With The Transbus.*

17. It is stipulated to and agreed that, in 1971, AM General decided to enter the transit bus market and to compete for UMTA-funded transit bus manufacturing contracts with GM and Flxible. AM General received its first contract in 1973 and delivered its first standard size bus in 1974. By 1975, AM General had acquired an approximately one-third share of the standard size transit bus market, and in 1976 it captured 47 per cent of all buses offered for bid.

18. It is stipulated to and agreed that at the time AM General began delivering its

transit buses in 1974, there had been no basic design change in marketed transit buses for close to 18 years—since the introduction of GM's so-called "new look" bus in the late 1950's.

19. It is undisputed that GM had produced a prototype new transit bus designated the RTX during the late 1960's. After displaying the RTX to transit operators throughout the country, GM restyled its prototype vehicle in 1970. The result was a new design which, while similar to the RTX, had several different and/or additional features. The new prototype was designated RTS–2.

20. It is stipulated to and agreed that, in implementing its mandate to assist in the development of improved mass transportation facilities and equipment, UMTA initiated in 1971 a major, $27 million project known as Transbus. UMTA's Transbus objective was to bring an improved transit bus to the public which would attract mass transit ridership (including the elderly and handicapped) and at the same time encourage competition in the transit bus supply industry.

21. It is stipulated to and agreed that in July of 1971, UMTA contracted with Booz-Allen Applied Research for the development of a prototype modern urban transit bus, Transbus. Boos-Allen in turn contracted with AM General, GM, and Rohr (Flxible), and each of these manufacturers agreed to deliver three prototypes for testing. The Transbus prototypes were completed, and a testing program was begun, in 1973–74.

22. Beginning in 1973, opposition to a number of Transbus features was voiced by a significant number of transit operators. The operators objected to Transbus' reduced seating capacity, its new and untested running gear, and especially its low floor, which necessitated a new and untested tire and wheel size and a double-axle rear suspension and which, it was believed, could cause curb and ·incline clearance problems. At least in GM's view, and very probably in UMTA's view as well, implementation of the Transbus program would be delayed longer than originally contemplated when the program was begun. *See* Killinger deposition at 44–48; plaintiff's exhibit 10 at 2–3; Herringer testimony, transcript of Feb. 3 and 4 hearing (hereinafter, "Tr.") at 133–34.

23. In early 1973, in light of GM's belief that the Transbus program faced serious difficulties, *see* finding of fact 22, GM decided to introduce its RTS–2 advanced-design bus to the market. In a May 25, 1973 public announcement, GM indicated that the RTS–2 would be .scheduled for initial production in about two years. The announcement stated that more than $32 million would be expended for equipment and tooling to produce the new model bus and discussed many of the new design and styling features which originated from GM's RTX and from Transbus and would be incorporated in the bus. The RTS–2 was not designed, however, to have as low a floor as the Transbus prototypes. *See* plaintiff's exhibit 1 at 14; plaintiff's exhibit 10 at 2; GM's exhibit 10.

C. *UMTA's "Low-Bid" Policy.*

24. Prior to the recent development of advanced mass transit buses, the mass transit buses offered by the three manufacturers were of roughly the same design and specifications. For that reason, UMTA and purchasing transit operators followed the practice of awarding contracts for such buses on the basis of low bid only, as price was the sole significant, distinguishing factor. However, it was UMTA's policy, and it was apparently understood in the industry, that, consistent with federal procurement standards and policy, awards could be made on the basis of other factors and that even sole source procurements of transit buses were possible in appropriate circumstances. As former UMTA Administrator Patricelli testified:

Q: [By Mr. Johnson, plaintiff's counsel] Did UMTA follow the low-bid philosophy?

A: UMTA, I believe, developed a practice, a pattern, during the early 1970's when the three manufacturers

had roughly the same design bus, for all intents and purposes, declaring those buses equal in competitive terms, and then price only was a factor that was taken into account, price and I believe on occasion delivery schedules.

But the practice that prevailed throughout the country in 1973, let's say, to 1975, 1976 or so, was that it was head-to-head price competition only among the three manufacturers, given this pretty much standard bus. [Tr. at 183]

.  .  .  .  .

Q: And there was no statement prior to January, 1976, that the longstanding, low-bid policy and practice—the low-bid practice, as you call it—of UMTA would be changed until the release of the draft statement in January of 1976, is that not correct?

A: Well, I think all of the parties were aware of the framework in which we were operating and the federal procurement guidelines, which indicate that price and other factors can be taken into account.

So there should be no surprise to anyone that other things can be valued. [Tr. at 184–85]

.  .  .  .  .

Q: Now, in January of 1975, was there any published policy of UMTA that covered the subject of the procurement plans for interim buses covered by the January, 1976 draft policy statement, sir?

A: I am not aware of any procurement policy with regard to interim buses in 1975, no, in January of 1975.

Q: So isn't it fair to say that if Mr. Herringer [the witness' predecessor] actually did tell General Motors that they could sell their mousetrap for more dollars, that it would have reflected a private communication and policy not reflected in the public documents?

A: No, I don't believe that would have been new information at all. I think general federal procurement policy is well known throughout the industry: that price and other factors may be considered.

Q: But what about the practice of the low-bid philosophy that you have described that UMTA had consistently followed from 1973 to 1975 and into 1976?

A: To my knowledge, that practice was followed only in the single case of the three pretty-much-standardized transit buses.

All other kinds of transit hardware procurement are not affected by any general practice of price only, to my knowledge. I can't imagine—frankly, I can't imagine—that somebody would have thought that there would be no way to produce something that is better, which costs more. It is not consistent with the congressional intent in seeking to support product improvement, generally. [Tr. at 187–88]

See also Tr. at 53, 65–67, 70, 77, 81, 104–08, 126–27, 146–47, 161–63; Bingman affidavit ¶ 7, at 3 (Nov. 12, 1976).

25. In 1973, during the time period when GM arrived at and announced its decision to bring the RTS–2 to the market, GM made efforts to convince UMTA to permit the funding of mass transit bus contracts awarded by federal grantees on bases other than low bid price. See plaintiff's exhibit 10.

26. On July 17, 1973, AM General officials, including AM General President Cruse W. Moss, met with Administrator Herringer to discuss, inter alia, the Transbus program and plans for an interim bus. When President Moss indicated that it was his belief that the Transbus prototypes would eventually lead to one standard bus, the Administrator indicated that this "was absolutely not the case." Mr. Herringer indicated that UMTA was considering a variety of Transbus alternatives, and that no decision on Transbus would be made "for a long time." GM's exhibit 19. See also GM's exhibit 20.

27. At the same meeting between AM General officials and UMTA officials, including Administrator Herringer, AM General officials were informed that GM and Flxible would have interim buses on the market in 18 months to two years and that, if circumstances warranted, transit operators could request and obtain desired specifications on such buses, if necessary through sole source procurement. All parties at the meeting agreed that in such circumstances, "The effect . . . is to *eliminate the low bid* and make possible a sole source at a higher price." GM's exhibit 19 (emphasis in original). *See also* GM's exhibit 20.

28. On August 15, 1973, after the aforementioned discussions with, *inter alia,* GM and AM General, Administrator Herringer informed Mr. Moss, President of AM General, that "we have reached a decision not to make any fundamental changes in the procurement procedure *at this time.*" Plaintiff's exhibit 11 (emphasis added). The Administrator added:

We will continue to monitor procurements to ensure that free, open competition is maintained. *At the same time, my staff will work with each grantee to enable him to purchase quality equipment and to take advantage of improvements in technology.*

*Id.* (emphasis added).

29. On September 27, 1973, in a report to President Moss, AM General's Chief Engineer analyzed the design characteristics of GM's anticipated RTS–2 bus. Near the end of his report, he noted that there were seven key design characteristics which the RTS–2 was likely to have and which AMG was not at that time able to provide. He noted that four of the seven "are design efforts that could be accomplished in the next year." He recommended that a study be initiated on the low-floor design characteristic "which would result in a design schedule and determine the effect on tooling and facilities." He concluded: "With these changes AMG could remain competitive in the near future." GM's exhibit 21.

30. As established in the five immediately preceding findings of fact, AM General was aware, as early as the summer of 1973, that: a) the Transbus program faced likely delays; b) UMTA's "low-bid policy," which had persisted only because of the roughly similar design features of buses available before the development of advanced mass transit vehicles, would be subject to alteration if and when operators requested certain specifications on the then-proposed interim buses; and c) GM was in the process of developing an interim bus with which AM General could compete "in the near future" if certain design plans were made.

D. *Official Policy on Interim Bus Funding.*

31. It is stipulated to and admitted that on January 8, 1975, Administrator Herringer issued a "Policy for Introducing Transbus into Nationwide Service" which was widely circulated to bus manufacturers and to the public.

32. It is stipulated to and admitted that the policy statement referred to above stated that UMTA would develop a performance specification for 40-foot Transbuses which would be a composite of the acceptable aspects of the three prototypes "as agreed upon" by the American Public Transit Association ("APTA") and the three manufacturers. The performance specification was to include a 23-inch or less floor height and would "allow any manufacturer to use its own styling, body construction, and manufacturing techniques in competing for the market."

33. With respect to the development of advanced interim buses, the policy statement declared:

In the interim, in addition to presently available bus designs, *UMTA will fund high-floor, two-axle buses incorporating styling and design changes consistent with the Transbus, should manufacturers desire to provide such changes.*

Plaintiff's exhibit 5.

**E.** *Interim Bus "Assurances" to General Motors.*

34. Following the release of the January 8, 1975 policy statement, Mr. E. R. Stokel of GM conferred with Administrator Herringer and Mr. Charles J. Daniels of UMTA. Administrator Herringer indicated to Mr. Stokel that UMTA would fund procurements of advanced-design buses such as GM's interim bus at a price higher than then-current models if the advanced-design buses were a better product, and that transit operators could secure GM's interim bus through sole source procurements if other such advanced buses were not available. Plaintiff's exhibit 4.

35. It is stipulated to and admitted that in June 1975, Administrator Herringer completed his tenure at UMTA. In July 1975, Robert E. Patricelli replaced Mr. Herringer. The outgoing Administrator did not convey to Mr. Patricelli the existence of any agreements or understandings with or commitments to GM concerning the funding of the RTS-2.

36. On October 31, 1975, Jerome C. Premo, Associate Administrator, provided Administrator Patricelli with a prior UMTA memorandum detailing contacts between GM and UMTA concerning the funding of GM's advanced-designed interim bus. The memorandum, written by Wilbur E. Hare of UMTA, stated:

> Several months ago top officials from GMC met with Mr. Herringer for the purpose of ascertaining his reaction if GM introduced a new bus. GM wanted to know if UMTA would fund the new bus. The answer was yes. . . .
>
> . . . . I believe Mr. Herringer's position was that the grantees could sole source the new bus if another new and comparable bus was not available. This position is consistent with UMTA's "Policy For Introducing TRANSBUS Into Nationwide Service."

Plaintiff's exhibit 15.

37. The contacts between GM and UMTA detailed in findings of fact 34 and 36 above in no way represent "private assurances" given to GM by UMTA in conflict with publicly-announced policy. First, the contacts discussed were, as Mr. Hare indicated, entirely consistent with UMTA's prior and publicly-announced policy statement of January 8, 1975:

> In the interim, . . . UMTA *will fund* high-floor, two-axle buses incorporating styling and design changes consistent with the Transbus, should manufacturers desire to provide such changes. [Emphasis added.]

*See* finding of fact 32. Second, the contacts were consistent with UMTA's "low-bid" policy and its prior indications that the policy was subject to change in appropriate circumstances. *See* finding of fact 24, specifically Administrator Patricelli's testimony that:

> To my knowledge, that practice [the low-bid policy] was followed only in the single case of the three pretty-much-standardized transit buses.
>
> . . . . I can't imagine—frankly, I can't imagine—that somebody would have thought that there would be no way to produce something that is better, which costs more. It is not consistent with the Congressional intent in seeking to support product improvement, generally.

Tr. at 188. Third, the contacts were consistent with the information AM General had been given *two years earlier,* at a meeting with Administrator Herringer. *See* findings of fact 26 and 27.

**F.** *UMTA's Sharpening Of Funding Policy For Interim Buses.*

38. It is stipulated to and admitted that during 1975, AM General offered its "B Model" or "Metropolitan Series" to compete on a low-bid basis during the pre-Transbus period with competitively-priced models of GM and Flxible. The "B Model" or "Metropolitan Series" was not, however, offered by AM General in response to UMTA's January 8, 1975 policy statement that "in the interim" UMTA would fund high-floor, two-axle buses consistent with Transbus.

39. In October 1975, GM announced that the RTS-2 was available for purchase, and

transit agencies began expressing interest in acquiring advanced bus designs such as the RTS–2. *See* Patricelli affidavit at ¶ 13 (Nov. 12, 1976).

40. Throughout October 1975, GM continued its efforts to convince UMTA to formalize its earlier indications that it would not insist on low-bid funding for advanced vehicles such as the RTS–2. *See* plaintiff's exhibit 13 at 4, plaintiff's exhibit 14, and plaintiff's exhibit 6 at 3.

41. It is stipulated to and admitted that a Consortium of interested transit agencies requested initially that it be allowed to acquire the RTS–2 through a sole source procurement, and that UMTA rejected that option in January 1976 on the grounds that such a procurement would be exclusionary.

42. In lieu of authorizing a sole source procurement, UMTA issued a draft policy statement on January 20, 1976, entitled "Urban Mass Transportation Administration Policy Statement on Grants for Acquisition of Transit Buses." This statement was circulated for comment to the American Public Transit Association and each of the three bus manufacturers. The statement indicated that UMTA would fund interim buses "at prices exceeding those of current transit buses." However, UMTA would require grantees to submit "a vehicle performance type specification" and would insist on competitive bidding. In addition, if only one manufacturer were to bid on such a procurement, "UMTA will allow [an] award provided that the grantee and the manufacturer demonstrate that the single bid price is fair and reasonable . . . ." Plaintiff's exhibit 16 at 4–5.

43. The January 20, 1976, draft statement was not in any way inconsistent with prior UMTA policy. Rather, it represented an initial attempt by UMTA to formalize its procurement procedures in the context of the anticipated sale of advanced-design interim buses such as the RTS–2. As Administrator Patricelli testified:

Q: [By Mr. Johnson, plaintiff's counsel] My question is: Was the January 20, 1976 policy statement the first public policy statement by UMTA as to how procurements would be handled in connection with so-called improved buses?

A: The interim bus?

Q: Yes.

A: Well to my knowledge, it was. *There were statements all along,* beginning in January, 1975, that interim buses would be supported for procurement, but I don't believe there were published statements as to how, and what procurement approach would be used.

And this is *our first effort to try to come up with an approach to the matter.*

Tr. at 184 (emphasis added).

44. In the statement of January 20, 1976, UMTA also re-affirmed its earlier policy statements on Transbus. Specifically, UMTA advised that the development of a specification for the "low floor" Transbus "is now complete" and projected "volume procurements" of Transbus in fiscal years 1976 and 1977. The statement also anticipated "required use of the Transbus specification" after the interim period. Plaintiff's exhibit 16 at 2, 4.

45. In commenting on the draft statement and in the course of a meeting with Administrator Patricelli after the statement was issued, GM officials continued to urge the rejection of any requirement that awards be made on the basis of low-bid only. GM also expressed strong opposition to certain aspects of UMTA's Transbus policy, as reflected in the draft statement, particularly UMTA's indication that the low floor specification and other design features would be mandated items after the interim period. Administrator Patricelli was receptive to GM's position, and he indicated that he would give it serious consideration and would attempt to accommodate GM's views. *See* plaintiff's exhibits 19 and 20.

46. On March 30, 1976, UMTA issued another draft policy statement ("Draft: Bus Procurement Guidelines") which established a process that would govern advance design transit bus procurements. In the

statement, UMTA recognized the need "to permit transit properties to purchase new model buses where such buses include product improvements that are commensurate in added benefit with their added cost." At the same time, UMTA recognized that as new models were offered it would be "difficult for individual transit properties to prepare specifications defining their own needs which do not appear to favor one manufacturer and create conditions where competitive bidding is difficult or impossible." The purpose of UMTA's policy was, therefore, "to develop a procurement program which assures effective competition among manufacturers and at the same time permits product improvements based on findings of need and a reasonable relationship between added benefits and added costs." The program proposed in the draft statement called for the development of an upgraded performance type specification which could be "stated in brand specific terms with acceptable alternatives where applicable." Transit agencies desiring to acquire such buses with grant funds were to submit a "justification of need analysis" which would "demonstrate why the proposed specification will produce the lowest and/or best value to the property and to the Federal Government for the funds invested." Upon UMTA approval of an upgraded specification and accompanying justification, "the transit property would be authorized to seek competitive bids." Plaintiff's exhibit 24.

47. General Motors found the March 30, 1976 policy statement to be a substantial improvement, as far as its interests went, over the earlier policy statements. *See* plaintiff's exhibit 26.

### G. *Development and Modification of the Consortium Specifications.*

48. It is stipulated to and agreed that, on April 21, 1976, the Consortium submitted a proposed bid package to UMTA which included the "justification of need analysis" required by the March 30, 1976 UMTA policy statement as well as a set of proposed specifications for an interim bus which would meet those needs.

49. The Consortium's specifications for an interim bus conformed in detail to the configuration, componetry, and materials of GM's RTS–2. As explained by the Administrator for Public Transportation for Houston, Texas:

Because the RTS/2 was the first vehicle introduced with superior improvements, and was the only such bus available at the time of the Consortium's original specification, the Consortium believed that specifying the features of the RTS/2 bus was a logical starting point for development of an advanced design specification.

Goodman affidavit at 2–3 (November 12, 1976).

50. On a number of occasions during UMTA's consideration of the Consortium's specifications, UMTA personnel, including the Administrator, referred by name to GM's RTS–2 when discussing the generic "interim bus." This was due not to any effort on UMTA's part to encourage the purchase of the RTS–2 to the exclusion of other interim buses, but because the RTS–2 was, at the time, the only interim bus available. As Administrator Patricelli explained:

I may have used that language, but I think one of the confusions that arises is the use of the terms "interim bus" and "RTS–2" interchangeably during the period of time when the RTS–2 was, in fact, the only interim bus that was available for purchase, sir.

Tr. at 167.

51. UMTA was aware, during its consideration of the Consortium's specifications, that AM General was unlikely to bid in response to the Consortium's invitation. Because of this situation, UMTA made efforts to maximize the number of bids which would be received on any procurement of interim buses, recognizing at the same time the necessity to secure advanced buses. Plaintiff's exhibit 30; Tr. at 148.

52. It is stipulated to and admitted that on May 3, 1976, AM General submitted a letter to UMTA which listed 93 objections to the Consortium's specifications and

which objected to the January 20 and March 30 policy statements.

53. It is stipulated to and admitted that on May 9, 1976, UMTA concurred in the Consortium's specifications subject to a 12-page list of revisions, many of which responded to the 93 objections listed by AM General. Included with UMTA's May 9 concurrence were appeal procedures which were to govern the Consortium's procurement and which were later made a part of the specification that was advertised.

54. It is stipulated to and agreed that, on May 12, 1976, the Consortium responded to UMTA's May 9 concurrence and AM General's letter of May 3 in an effort to justify the inclusion of many of the features which UMTA had suggested should be revised. On May 19, 1976, the Consortium formally submitted its second set of specifications to UMTA for consideration. The specifications were revised in many respects pursuant to UMTA's initial May 9 concurrence, but not revised as to a number of the other revisions presented in UMTA's initial concurrence. The latter were addressed in a 22-page letter submitted by APTA on May 20, 1976.

55. It is stipulated to and admitted that on May 27, 1976, after AM General had again submitted comments critical of the Consortium's submission, UMTA concurred in the Consortium's revised specifications on the express condition that they be altered in accordance with a 22-item list of modifications.

56. It is stipulated to and admitted that, following these negotiations and exchanges between UMTA, the Consortium, APTA, and AM General, the Consortium, by letter dated June 7, 1976, submitted its final specifications. These specifications complied with UMTA's 22-item list of conditions and were advertised for bid on June 18, 1976.

H. *The Administrative Appeal.*

57. It is stipulated to and admitted that, on July 1, 1976, after the specifications were advertised for bid, representatives from AM General and the Consortium met in Houston, Texas, for a "pre-bid" conference to discuss the specifications. A transcript of that conference was later forwarded to UMTA.

58. It is stipulated to and admitted that, following the conference, pursuant to the appeal procedure set out in the specifications, AM General submitted a lengthy "request for approvals" to the Consortium which was forwarded to each of the members and to UMTA. These requests, as well as those of the other manufacturers, were ruled on by the Consortium, and its decision was forwarded to each of the manufacturers and UMTA on July 14, 1976.

59. It is stipulated to and admitted that, on July 20, 1976, AM General formally appealed the Consortium's rulings on its requests for approvals to UMTA. The appeal was later supplemented by a letter dated July 27, 1976, with an attachment critical of the Consortium's "justification of need analysis." Another supplement was filed, by letter dated August 10, 1976, with Exhibits 1 through 10.

60. Recognizing the importance of the initial procurement of advanced design buses, Administrator Patricelli had, in April of 1976, directed Deputy Administrator Charles F. Bingman to take personal charge of the procurement and any appeals to UMTA by prospective bidders. It was clear that AM General would offer its current bus and that AM General would be likely to appeal to UMTA if the Consortium insisted upon specifications which AM General's bus could not meet. Thus, an appeal was expected. *See* Patricelli affidavit at ¶ 22 (Nov. 12, 1976); Bingman affidavit at ¶ 13 (Nov. 12, 1976).

61. It is undisputed that, in order to assure a prompt decision on these important appeal matters, UMTA established an appeals Evaluation Team, organized in two tiers. The first "working level" tier, headed by UMTA's Director of the Office of Program Support, included UMTA officials with expertise in mechanical engineering, transit bus operations and maintenance, and federal procurement law and procedure.

62. It is undisputed that UMTA also contracted with Booz-Allen, prime contractor for the Transbus program, to provide additional technical expertise. To complete the team, UMTA contracted with three retired transit experts who had detailed practical knowledge of operations and maintenance problems associated with current transit buses.

63. It is undisputed that the second tier of the Evaluation Team was a Policy Overview Committee headed by the Deputy Administrator. Also on this Policy Overview Committee were four UMTA officials who held positions with policy-making authority and responsibility. The working level team reported to the Policy Overview Committee, which had final decision-making responsibility.

64. After the AM General appeal was forwarded to UMTA, the Consortium furnished each member of the Evaluation Team with a document detailing the reasons supporting the Consortium's resolution of AM General's requests for approvals. *See* Administrative Record (hereinafter, "Record"), attachment 27.

65. It is undisputed that the Evaluation Team decided that the key to the appeal was the identification of "major technical areas" where the Consortium's specification called for major systems not on the current model buses of any of the manufacturers. For AM General, nine major technical areas were identified: brakes, front suspension, power plant compartment, body general (air drag, materials, doors), electrical system, air conditioning and ventilation system, and passenger seats.

66. It is undisputed that the Evaluation Team specifically considered whether the Consortium's specification was exclusionary or discriminatory. This consideration was based on an analysis of the Consortium's "justification of need analysis," review of other documents submitted in support of the inclusion of a given feature, the expertise of the Evaluation Team, and review of appeal documentation supplied to UMTA by AM General. The added time and effort required of a manufacturer to meet the Consortium's specifications was taken into account in this determination.

67. It is undisputed that once the justification for the inclusion of a given feature in the specifications was established, the analysis shifted to a consideration of whether the item proffered by AM General was, in fact, equal to that requested by the Consortium. The Consortium's rationale for rejecting a manufacturer's request together with the descriptive criteria in the specification were weighed by the Evaluation Team against the contents of AM General's appeal to UMTA.

68. It is undisputed that the Evaluation Team met in daily sessions from August 2 through August 6, 1976, and from August 9 through August 13, 1976, filing interim reports to the Policy Overview Committee.

69. It is stipulated to and admitted that resolution of the "major technical areas" was quite important, because that resolution determined the outcome of many minor elements of the appeal. Five of the major technical areas were resolved in favor of AM General: brakes, power plant compartment, body general (air drag, doors), air conditioning and ventilation system. Booz-Allen's prime input was on the resolution of these major technical areas.

70. A sixth major technical area, dealing with independent front suspension, was resolved against AM General; however, in an effort to increase competition, the Policy Overview Committee required the Consortium to allow manufacturers to specify either independent front suspension or solid axle front suspension (featured on AM General's and Flxible's buses). *See* Record, attachments 37 and 39.

71. For each of the nine major technical areas of AM General's appeal, UMTA offered a summary of the rationale for the appeal decision. *See* Record, attachment 37. All of these decisions, and specifically the decisions in the three areas in which AM General's appeal was denied, are well-explained in the aforementioned summaries and are amply supported by the Consortium's "justification of need analysis," the

specifications, and various other materials taken into consideration by the Evaluation Team which form a portion of the Administrative Record. *See* Record, especially attachments 1, 2, 4, 5, 6, 8, 9, 10, 12, 13, 17, 19, 21, 27, and 37.

72. The appeal decisions and accompanying explanations for the 61 individual denials of AM General's appeals are also amply supported by the Consortium's "justification of need analysis," the specifications, and various other materials taken into consideration by the Evaluation Team which form a portion of the Administrative Record. *See* Record, especially attachments 1, 2, 4, 5, 6, 8, 9, 10, 12, 13, 17, 19, 21, 27, and 37.

73. It is stipulated to and admitted that the appeal decision was transmitted to the Consortium and the manufacturers on August 16, 1976, and was later issued by the Consortium as an amendment to the specifications.

74. It is stipulated to and admitted that the Consortium failed to notify the manufacturers that a solid front axle was acceptable. UMTA thereafter required the Consortium to notify all manufacturers that a solid front axle was acceptable. Bid opening was extended one week to September 8, 1976.

75. It is stipulated to and admitted that only one bid was received by the Consortium on September 8, 1976. That bid was submitted by GM, which offered in satisfaction of the Consortium's specifications its RTS-2 vehicle.

## II. CONCLUSIONS OF LAW

1. The Court has subject-matter jurisdiction herein pursuant to 28 U.S.C. § 1331(a). Venue of this action properly lies in this district pursuant to 28 U.S.C. § 1391(e).

2. In providing federal financial assistance to state and local public transportation authorities for the development of mass transit systems, the federal defendants are required to comply with 49 U.S.C. § 1602(a)(1), which prohibits the use of federal mass transit grant funds "to support procurements utilizing exclusionary or discriminatory specifications."

■ 3. While it is clear that 49 U.S.C. § 1602(a)(1) prohibits specifications adopted for the purpose of excluding a competitor from bidding without regard to the merits of the product involved, neither the language of the statute nor its legislative history indicates that the statute was intended to prohibit specification of a product improvement simply because not every competitor chooses to offer such an improved product. Indeed, the legislative history of the statute indicates otherwise. *See* 119 Cong.Rec. 32821 (1973) (remarks of Rep. Brademas). Application of a rule of reason would also preclude any such interpretation of the statute, for the result would be anticompetitive. Such an interpretation would also foster stagnation in the development of the product involved.

4. The UMT Act contains a Congressional finding, *inter alia,* that:

> the welfare and vitality of urban areas, the satisfactory movement of people and goods within such areas, and the effectiveness of housing, urban renewal, highway, and other federally aided programs are being jeopardized by the deterioration or inadequate provision of urban transportation facilities and services, the intensification of traffic congestion, and the lack of coordinated transportation and other development planning on a comprehensive and continuing basis . . . . .

49 U.S.C. § 1601(a)(2). The declared purposes of the Act, therefore, are:

> (1) to assist in the development of improved mass transportation facilities, equipment, techniques, and methods, with the cooperation of mass transportation companies both public and private;
>
> (2) to encourage the planning and establishment of areawide urban mass transportation systems needed for economical and desirable urban development, with the cooperation of mass transportation companies both public and private; and

(3) to provide assistance to State and local governments and their instrumentalities in financing such systems, to be operated by public or private mass transportation companies as determined by local needs.

49 U.S.C. § 1601(b). An interpretation of the "exclusionary or discriminatory" clause as prohibiting specification of a product improvement simply because one or more competitors choose not to offer such an improvement would obviously be detrimental to the purposes of the Act, purposes which have taken on even greater significance in light of this nation's growing energy crisis.

■ 5. 49 U.S.C. § 1602(a)(1) would prohibit the federal defendants from providing one supplier, through secret, private, and undisclosed deviations from publicly-announced policy, with an unfair competitive advantage over those suppliers who have relied upon the defendants' public declarations of policy. Similarly, the statute would prohibit the federal defendants from abruptly revising their public policies to accommodate the investment decisions of one supplier, to the detriment of other suppliers that relied upon the prior public policies. Finally, the statute would prohibit the federal defendants from implementing any such revised policies without giving competitors enough time to make informed investment decisions and thereby to compete under the new policies.

■ 6. In the instant case, none of the practices discussed above took place. First, there were no such secret assurances provided by UMTA to GM. All of the discussions between UMTA and GM were consistent with UMTA's publicly-announced policies. Moreover, most of the allegedly secret assurances complained of in this case occurred long after AM General had been informed of the strong possibility that UMTA's "low-bid" policy would be abandoned if interim buses were developed. *See* findings of fact 26 and 27. In addition, the evidence reveals that UMTA's decisions were not based on such factors as accommodating a manufacturer's investment needs, but were instead grounded in concern over

the acceptability of and potential problems with the Transbus program and in a desire to provide the public with advanced buses, even if only on an interim basis. Finally, the evidence reveals that AM General had sufficient notice of UMTA's policies with respect to the possible funding of interim buses such that, if it had chosen to do so, it could have developed a competitive product. *E. g.,* findings of fact 26–30.

7. In reviewing the federal defendants' actions with respect to the challenged specifications, this Court must determine whether those actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ 8. Review of the extensive administrative record arising out of the elaborate administrative procedure provided by UMTA for AM General's appeal reveals that UMTA's decision was based on consideration of "relevant factors" and within the permissible scope of its discretion as defined by the UMT Act. *Citizens to Preserve Overton Park, Inc., v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). *Compare D. C. Federation of Civic Associations v. Volpe,* 148 U.S.App.D.C. 207, 459 F.2d 1231, 1246–48 (1971), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972). Specifically, the reasons for UMTA's denial of AM General's appeal in three of nine major technical areas and in 61 of 102 individual appeals are satisfactorily set forth, and those reasons are amply supported in the administrative record. UMTA's decision to fund interim advanced buses and the specific decisions reached on the specifications therefor reflect choices considered and made within the scope of its discretion under the UMT Act.

9. In accordance with the above conclusions the Court finds there is no evidence that UMTA took actions which had the effect of supporting "procurements utilizing exclusionary or discriminatory specifications," 49 U.S.C. § 1602(a)(1); nor is there evidence that any of UMTA's appeals decisions on the specifications were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

10. Judgment on Counts I and II will therefore be entered for defendants, in an Order issued of even date herewith, and the stay of federal funding of the procurement in question centered by this Court on September 2, 1976 will be lifted.*

### ORDER

In accordance with the Findings of Fact and Conclusions of Law issued of even date herewith, it is, by the Court, this 21st day of April, 1977,

ORDERED, that judgment be entered herein for defendants on Counts I and II of plaintiff's amended complaint; and it is

FURTHER ORDERED, that the portion of this Court's Order of September 2, 1976, set forth below be vacated, rescinded, and of no further force and effect:

I. Pending a final determination by this Court on the merits of Plaintiff's Complaint herein, and pending further order of this Court, Defendants shall:

A. Refrain from taking any action with respect to funding the purchase of any buses pursuant to the specifications issued by the Consortium identified in Plaintiff's Complaint and approved by the Urban Mass Transit Administration, including without limitation, any commitment, obligation, or disbursement of Federal funds by Defendants, or any approval by Defendants of the expenditure of any Federal funds by the Consortium;

B. Refrain from taking any other action with respect to the specifications described above or in furtherance of any contracts based upon such specifications

---

* At the conclusion of the aforementioned hearing of February 3, and 4, 1977, counsel for the plaintiff brought to the Court's attention plaintiff's motion to compel the production of excised portions of two documents produced by GM in response to a request for documents made pursuant to Fed.R.Civ.P. 34. To resolve the matter, all parties agreed that the Court would view the documents *in camera* and would notify the parties if the excised portions were not either proprietary or irrelevant, as GM had claimed. The Court has reviewed the excised portions and has determined that there is no question that they are proprietary and entirely irrelevant to the issues presented.