**MAIN–AMHERST BUSINESS ASSOCIATION, INC., on its own behalf and on behalf of all others similarly situated, Plaintiff,**

v.

**Brock ADAMS, Individually and as Secretary of the United States Department of Transportation, Richard Page, Individually and as Administrator of the Urban Mass Transportation Administration, Niagara Frontier Transit Authority, Chester Hardt, Individually and as Chairman of the Niagara Frontier Transportation Authority, Kenneth Knight, Individually and as General Manager of the Niagara Frontier Transportation Authority-Metro Construction Division, and their agents, employees, successors in office, assistants and all persons acting in concert or cooperation with them or at their discretion or under their control, Defendants.**

**No. CIV–78–590.**

United States District Court, W. D. New York.

Dec. 7, 1978.

Michael Paskowitz, Buffalo, N. Y., for plaintiff(s).

1. Hereinafter "the LRRT".

2. Hereinafter "the NFTA".

3. The Complaint does not clearly set forth which sections of Titles 42 and 49 each defendant is supposed to have violated.

William E. Straub, Buffalo, N. Y. (David M. Coffey, Robert E. Pearman, Buffalo, N. Y., of counsel), for defendants Chester R. Hardt, Kenneth Knight, Niagara Frontier Transp. Authority.

Richard J. Arcara, U.S. Atty., Buffalo, N. Y. (Edward J. Wagner, Asst. U.S. Atty., Buffalo, N. Y., Trudy B. Levy, Attorney-Advisor, UMTA, Wash., D.C., of counsel), for defendants Brock Adams, Richard Page.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

Plaintiff, a not-for-profit membership corporation, seeks the issuance of a preliminary injunction preventing "defendants from taking any further action with respect to the Buffalo Light Rail Rapid Transit System[1] or from disbursing or obligating any funds to the Niagara Frontier Transportation Authority"[2] for such project. Defendants oppose the motion.

Subsequent to the preparation of the final Environmental Impact Statement ("EIS") and the holding of final public hearings on the LRRT project, the NFTA changed the method of construction to be utilized at the Amherst Street station. According to plaintiff, Hardt's, the NFTA's and Knight's actions of applying for and possibly receiving federal funds without holding new public hearings violate plaintiff's rights under 49 U.S.C. §§ 1601 et seq., 42 U.S.C. §§ 4321–4335 and 1983. Plaintiff also alleges that the federal defendants (Adams and Page) have violated or will violate plaintiff's rights under such sections by approving funds for the LRRT with knowledge that the required public hearings have not been held.[3] Defendants assert that the change in the construction methods does not necessitate the holding of new public hearings or the drafting of a supplemental EIS.[4] In addition, defendants

4. The federal defendants argue that the Complaint does not allege a violation of 42 U.S.C. § 4332 with respect to the need for a supplemental EIS and that this issue is not properly before the court.

argue that plaintiff has had an adequate opportunity to be heard on this issue.

### FINDINGS OF FACT

On September 12, 1978 the Urban Mass Transportation Administration approved the NFTA's application for the LRRT project. Written notification of the approval was sent to Hardt, Chairman of the NFTA, September 15, 1978. The federal share of the project is $359 million. The line extends from the D.L. & W.R.R. terminal to the south campus of the State University of New York, a distance of approximately 6.4 miles. The downtown section of the line will be at surface grade for a distance of 1.2 miles and the remainder of the line will be underground. Three and one-half miles of the underground section are to be constructed by rock tunnel boring and 1.7 miles by cut-and-cover. There will be six surface stations and nine underground stations.

Public hearings were held in April 1972 and July 1974 prior to the preparation of the draft EIS. After the draft EIS was prepared and circulated to the required federal, state and local agencies and to the public, public hearings were held July 14, 1977. Subsequent to such hearings a final EIS was prepared. The final statement was approved for publication December 15, 1977 and circulated to the various federal, state and local agencies commencing December 27, 1977. The final statement was also made available to the public. The statement was not referred to the Council on Environmental Quality and the environmental impact statement process therefore was completed January 25, 1978.

Engineering tests conducted after the July 14, 1977 public hearings and the preparation of the final EIS indicated the presence of fractured rock and excess water at the original vertical alignment of the LRRT station at Main and Amherst streets. As a result, the vertical alignment of the station was brought closer to the surface and the method of construction was changed from rock tunnel boring to cut-and-cover. The original alignment of the station was based on tests done in 1973.

The Amherst Station is mentioned on page 4–29 of the EIS as being part of the rock tunnel section of the project. No specific method of construction for the stations in this section of the line are mentioned in the EIS, although the diagram on page 4–33 indicates that the stations would also be constructed by the rock tunnel method. Pages 5–59 through 5–67 discuss in general terms the impacts of the two construction methods. Construction procedures for the stations in the cut-and-cover section were not formalized in the EIS; however, the basic procedures for the tunnels and the stations would be similar. Street traffic is rerouted while shallow trenches are dug, earth support systems are installed, buildings are underpinned and decking is installed. Traffic is returned to the street and travels on the decking. Once excavation is complete and the backfilling nears the surface, decking is removed and traffic is rerouted. Once the pavement is restored and the area cleaned up, traffic is permanently moved back onto the street. "Cut-and-cover construction is highly disruptive for short periods of time despite mitigative measures. Traffic flow * * * is bound to be impeded by construction especially during peak hours when car and bus traffic is heavy. * * * The visual environment will be disrupted and street-level noise and air pollution increased." EIS at pages 5–61 through 5–62. Dust, dirt and air pollution from the construction are to be controlled by the contractor. "Rock tunnel construction is the least disruptive of any of the construction techniques to be used on this project * * *." EIS at 5–65. Under the rock tunnel method of construction, drilling and blasting would be required during the construction of vent shafts and station access points. The original plans for the Amherst Station called for extensive sewer work to be performed at the intersection of Main and Amherst streets. Physical construction on the Amherst Station is not set to begin until January 1980, although acquisition of rights of way, relocation and demolition is to commence as of June, 1979.

Prior to the change in construction method, plaintiff, through a representative, went on record as supporting the location of the LRRT station at Main and Amherst streets. After the change, plaintiff raised many questions concerning the impact of cut-and-cover construction, particularly the economic and social impact it would have on the neighborhood. Plaintiff on March 14, 1978 submitted two pages of questions to the NFTA concerning construction of the station and the NFTA responded April 13th. The excavation for the station structure will be approximately 330 feet long by 60 feet wide and 40 feet of such width will extend into Main Street. Two lanes of traffic are to be maintained at all times and a third lane if necessary during peak periods. Traffic restrictions will exist for one month for excavation and decking of the tunnel boring machine removal pits. Excavation and decking of the station structure will require traffic restrictions for three months. It will take six months to complete the excavation for the station structure. Once the structure is completed, traffic restrictions will exist for four months while the street is restored. It is projected that the street will be back to full width approximately nine months from the start of construction. The station plans were changed to reduce the overall width of the station and the horizontal alignment was changed so that all construction will take place on the west side of Main Street and adverse impacts to the businesses on the east side of Main Street will be reduced. Access to all businesses and residences will be maintained. Originally Parker Avenue was to be closed for a two-week period, but the length of the station was shortened so that it would not be in the immediate right of way; therefore Parker Avenue will not have to be closed entirely. The volume of material to be excavated does not differ greatly between the two construction methods.

The NFTA has met with plaintiff on several occasions to discuss the change in construction methods. In addition, the issue was discussed repeatedly at the Community Rapid Transit Interaction Panel ("CRTIP") monthly meetings, from January 1978 through June. As noted above, changes were made in the construction plans to lessen the adverse impact of construction on the community.[5]

Federal officials were cognizant of the concerns held by the Main-Amherst Businessmen's Association. The transcripts of the public hearings were reviewed, as were the NFTA's responses to plaintiff's questions and the results of the NFTA's various meetings with plaintiff. The NFTA submitted a detailed statement on the impacts of cut-and-cover construction at the station site and the federal officials also noted the NFTA's cooperation with CRTIP which was set up to work with the NFTA in planning and developing the LRRT Project. The Secretary of Transportation ("the Secretary") concluded that the record allowed him to make the findings required by 49 U.S.C. §1610(b) and (c) and also concluded that a supplemental EIS was not necessary.

*CONCLUSIONS OF LAW*

■ Jurisdiction over the subject matter of this action exists under 28 U.S.C. § 1331(a). *Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323, 1329 (4th Cir.), *cert. denied* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); *Simmans v. Grant,* 370 F.Supp. 5, 12 (S.D.Tex.1974); *Sierra Club v. Froehlke,* 359 F.Supp. 1289, 1335 (S.D.Tex.1973), *reversed on other grounds, Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir. 1974).

■ A preliminary injunction may not be granted unless the moving party demonstrates "possible irreparable injury *and* ei-

---

**5.** Exhibit G–1 attached to the affidavit of Joan P. Schmidt, submitted by defendant NFTA, states that utilizing tunneling methods through fractured rock would represent a substantial change in the impact of the construction because extra shafts for removal of the tunnel boring machines would be required at some distance from the station in both directions and because there would have to be a greater utilization of the drill and blast method of construction.

ther (1) *probable success on the merits or* (2) *sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.*" *Caulfield v. Board of Education,* 583 F.2d 605 (2d Cir. 1978) (emphasis in original). The instant complaint does not set forth facts demonstrating the possibility of irreparable injury. In its brief, plaintiff argues that a preliminary injunction should be issued because it has met the second prong of the above-cited test. However, the brief does not mention the issue of irreparable harm. When pressed at oral argument concerning the issue of irreparable harm, plaintiff's attorney stated that the defendants' continuing violation of plaintiff's statutory rights establishes irreparable harm.[6] There are situations where a clear violation of a statute embodying strong national policy warrants injunctive relief, even though there is no factual showing of irreparable harm. *Conservation Soc. of S. Ver., Inc. v. Secretary of Tran.,* 508 F.2d 927 (2d Cir. 1974), *vacated and remanded,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), *reversed on other grounds,* 531 F.2d 637 (2d Cir. 1976). Many of the cases in which such injunctions were granted involved violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA").[7] *See, e. g., Environmental Defense Fund v. Tennessee Val. Auth.,* 468 F.2d 1164 (6th Cir. 1972); *Scherr v. Volpe,* 466 F.2d 1027 (7th Cir. 1972); *Lathan v. Volpe,* 455 F.2d 1111 (9th Cir. 1972). Sections 1602 and 1610 of Title 49 incorporate the policies of NEPA into the Urban Mass Transportation Act ("UMTA"). The purpose of the public hearing is to allow all persons who have a significant economic, social or environmental interest in a project to present their views and have them considered by the local agency as well as the responsible federal officials. In proper circumstances the Secretary's and the applicant's failure to comply with the requirements of such sections could form the basis for the granting of a preliminary injunction.[8] However, the facts and the equities of the instant case militate against the issuance of a preliminary injunction.

The United States Court of Appeals for the Second Circuit has rejected a per se rule in cases involving NEPA violations. *State of New York v. Nuclear Reg. Com'n,* 550 F.2d 745 (2nd Cir. 1977). Even if a court concludes that a NEPA violation exists, it must exercise its discretion and decide whether the equities of the particular case merit the award of a preliminary injunction. *Id.* Factors to be considered are whether the continuance of the construction would defeat the purpose of the EIS and whether the environment would be immediately and irreparably harmed by the commencement of the project. Plaintiff in the instant case does not object to the LRRT project or to the location of the station but wants further consideration to be given to the method of construction that will be utilized at the site. Construction is not scheduled to begin until January 1980. There is ample time for a new public hearing to be held and consideration to be given

---

6. Plaintiff's attorney also stated that businessmen would leave the neighborhood because the construction would impede access to their stores and consequently would cause a decline in their revenues. This statement was not supported by affidavits or testimony. An attorney's argument cannot be used to support a finding of irreparable harm.

7. In *most cases* the NEPA violation involves an insufficient EIS or the lack of an EIS. Plaintiff's complaint does not raise this issue. See *infra* for a discussion of the public hearing requirements of NEPA.

8. Plaintiff alleged that defendants' actions violated its rights under 42 U.S.C. § 1983. Section 1983 does not apply to federal officials acting under color of federal law. *McNally v. Pulitzer Pub. Co.,* 532 F.2d 69 (8th Cir.), *cert. denied,* 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1976); *Weise v. Syracuse,* 522 F.2d 397 (2d Cir. 1975). Plaintiff can only establish a violation of its rights under 42 U.S.C. § 1983 by proving that the state defendants violated its rights under 42 U.S.C. § 4321 *et seq.* or 49 U.S.C. § 1602. Because of my conclusions on the issues of irreparable harm and plaintiff's likelihood of success on the merits, I have not discussed 42 U.S.C. § 1983 as a basis for the award of a preliminary injunction.

to alternative construction methods should plaintiff ultimately prevail on the merits. There is no immediate threat of irreparable harm to the environment. In addition, there is no evidence in the record to indicate that the NFTA would not conduct the public hearings in good faith if ordered to do so by the court. The public hearings held prior to the approval of the project adequately provided for the presentation of ideas, criticisms and suggestions. All interested parties had an opportunity to be heard. As noted, the NFTA has met with plaintiff several times to explain the new method of construction and has answered written questions submitted to it by plaintiff. An injunction based on statutory noncompliance is not warranted in this case. *See, Essex Cty. Preservation Ass'n v. Campbell,* 536 F.2d 956 (1st Cir. 1976).

■ Plaintiff has also failed to demonstrate a probability of success on the merits. The Administrative Procedure Act prescribes the standard of review applicable to the actions of the federal defendants in this case. *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Citizens to Preserve Foster Park v. Volpe,* 466 F.2d 991 (7th Cir. 1972); *AM General Corp. v. Dept. of Transp.,* 433 F.Supp. 1166 (D.D.C.1977); *Philadelphia Council of Neighborhood v. Coleman,* 437 F.Supp. 1341 (E.D.Pa.1977), *aff'd without opinion* 578 F.2d 1375 (3d Cir. 1978); *Movement Against Destruction v. Trainor,* 400 F.Supp. 533 (D.Md.1975). An in-depth review of the administrative record must be conducted to determine whether the agency's actions should be declared unlawful under 5 U.S.C. § 706(2)(A) or (D).[9] *Id.* In order to make this determination, the court must consider whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The reviewing court may not substitute its judgment for that of

the agency. *Citizens to Preserve Overton Park v. Volpe, supra; Philadelphia Council of Neighborhood v. Coleman, supra; Movement Against Destruction v. Trainor, supra.* In addition, the court must carefully scrutinize the agency's actions to be sure it has complied with statutorily mandated procedures. *See, Inman Park Restoration v. Urban Mass Transp. Admin.,* 414 F.Supp. 99 (N.D.Ga.1975), *aff'd per curiam* 576 F.2d 573 (5th Cir. 1978). As regards the actions of the state defendants, the court must insure that they comply with applicable statutes and regulations.

■ The complaint does not specifically set forth the manner in which defendants violated NEPA. Plaintiff argues in its brief that the change in construction methods is a substantial change in the project and that therefore a supplemental EIS is necessary. However, the complaint contains no allegations concerning the need for a supplemental EIS. The arguments in plaintiff's brief cannot be read into the complaint to support its request for a preliminary injunction. Plaintiff did allege that the lack of supplemental public hearings violated its rights under NEPA. Section 4332 of such act does not mandate the holding of public hearings. *Henly v. Kleindienst,* 471 F.2d 823 (2d Cir.), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1972); *Trinity Episcopal Sch. Corp. v. Harris,* 445 F.Supp. 204 (S.D.N.Y.1978). Regulations promulgated by the Council on Environmental Quality set forth criteria for federal agencies to utilize in determining whether to hold a public hearing. 40 C.F.R. § 1500.7(d). If an agency decides to hold a public hearing such must be held as early as possible and prior to its decision on major federal action. The hearings are to include consideration of the environmental aspects of the proposed action and, if a draft environmental impact statement exists, it should be made available to the public 15 days prior to the hearing. The regulations do not discuss the issue of supplemental

---

9. The Complaint does not set forth facts indicating unlawfulness under 5 U.S.C. § 706(2)(B) or (C).

hearings at later stages of project development, although they do envision that more than one hearing may be held. One of the criteria for determining the necessity of a hearing is "(4) the extent to which public involvement already has been achieved through other means, such as earlier public hearings, meetings with citizen representatives, and/or written comments on the proposed action." 40 C.F.R. 1500.7(d). The federal defendants reviewed the hearings held by the NFTA and the interaction between the NFTA and interested citizen groups. They concluded that the public had had an adequate opportunity to be heard and that no new public hearings were needed. At this juncture it cannot be said that the decisions of the Secretary and the Urban Mass Transportation Administrator were arbitrary or capricious, nor can it be said that they failed to follow the procedures set forth in the applicable statute and regulations.

Section 1602 of Title 49 requires grant applicants to certify that they have "afforded an adequate opportunity for public hearings." Section 1610(b) of such title requires the Secretary to review the transcript of the hearings "to assure that an adequate opportunity was afforded for the presentation of views by all parties with a significant economic, social or environmental interest * * *." In addition, subsection (c) prohibits the Secretary from approving any project unless he finds that an adequate opportunity was given for the presentation of views by interested parties and that "fair consideration has been given to the preservation and enhancement of the environment and to the interest of the community in which the project is located * * *." If the Secretary determines that the record does not permit him to make such a finding, he is to conduct hearings after adequate notice to interested persons.

 The gravamen of plaintiff's complaint is that the change in construction methods represents a significant change in the project and thus requires new public hearings. Plaintiff argues that the cut-and-cover method of construction causes greater adverse impact on the surrounding community than does the rock tunnel boring method. Defendants admit that area of surface disruption that will be caused by the cut-and-cover method is larger than that originally envisioned under the rock tunnel boring method, but deny that this represents a significant change in the environmental, social and economic impact of the project. Defendants point out that the original plans called for the use of the cut-and-cover method of construction during the construction of the station's mezzanine.

There is no clear-cut rule for gauging whether a proposed change is substantial. Compare, Philadelphia Council of Neighborhood v. Coleman, supra (new public hearing not required even though a cost benefit study and draft EIS were released one year after the hearings); Inman Park Restoration v. Urban Mass Transp. Admin., supra (change in construction plans for two stations does not require supplemental EIS to be drafted), with Essex Cty. Preservation Ass'n v. Campbell, supra (supplemental EIS needed due to Governor's moratorium on highway construction); Saunders v. Washington Metropolitan Area Trans. Auth., 359 F.Supp. 457 (D.D.C.), remanded, 159 U.S. App.D.C. 55, 486 F.2d 1315 (1973) (new hearing required because the location of vent shafts was unknown at the time of the original public hearings); Bootery, Inc. v. Washington Met. Area Transit Auth., 326 F.Supp. 794 (D.D.C.1971) (new hearings required for persons being displaced by construction of stations because station sites were unknown at the time of the hearing). Changes causing only temporary effects may, in some circumstances, be substantial. Simmans v. Grant, supra.

The change in construction methods will produce short-term environmental effects [10]; however, the station plans have been modified and the adverse effects of the

---

**10.** See, findings of fact supra for a discussion of the effects caused by cut-and-cover construction.

cut-and-cover method have been limited. Access to local businesses and residences will be maintained at all times. The change in construction methods does not appear to be a substantial change requiring a new public hearing. Even if it were, there would be no reason to require a new public hearing if all interested parties have had an adequate opportunity to be heard. The House Report accompanying the Urban Mass Transportation Act shows it was not Congress's intent to burden local officials with repeated public hearings every time a change was made. [1970] U.S.Code Cong. & Admin.News, pp. 4092, 4097. At this point, the evidence indicates that the plaintiff and other interested members of the public have had an adequate opportunity to be heard. Officials of the NFTA have met with both plaintiff and the Parkside Community Association (a group of nearby residents and businessmen) concerning the proposed change. The NFTA has continued to meet and discuss the proposed change with CRTIP. Perhaps upon fuller development of the record, by affidavit or testimony, plaintiff can show that its proposals were not listened to and that defendant NFTA did not give adequate consideration to their suggestions. For the present, plaintiff has not shown a likelihood of success on the merits of its 49 U.S.C. § 1602 claim. Nor has plaintiff shown a likelihood of success on the merits of its 49 U.S.C. § 1610 claim. The papers before the court indicate that the Secretary and the Administrator complied with the review procedures set up by the statute and that the Secretary's determination under section 1610(c) and his consequent approval of the Buffalo LRRT project was not arbitrary or capricious.

Furthermore, the balance of hardships tips decidedly in defendants' favor. It has been estimated that each day's delay will add $120 thousand to the cost of construction.[11] Defendant NFTA has taken steps to mitigate the adverse impact of cut-and-cover construction. *See, Conservation Soc. of*

*S. Ver., Inc. v. Secretary of Tran., supra; East 63rd Street Ass'n v. Coleman,* 414 F.Supp. 1318 (S.D.N.Y.1976). In addition, physical construction of the station is not scheduled to begin until January of 1980, allowing ample time for new public hearings to be held should plaintiff ultimately prevail.

It is therefore hereby

ORDERED that plaintiff's motion for a preliminary injunction is denied.

---

**11.** Affidavit of Robert Dobbins, Scheduling and Cost Analyst in the office of Contracts and Program Control for the Metro Construction Division of NFTA.