571 F.2d 697
 48 A.L.R.Fed. 898
 WESTPORT TAXI SERVICE, INC. and Michael and Anthony
Gilbertie, Plaintiffs-Appellants,
v.
Brock ADAMS, Secretary of Transportation, Westport Transit
District, Paul R. Green, John E. Meyers, and
Richard Bradley, Defendants-Appellees.
 No. 116, Docket 77-6074.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 5, 1977.
Decided Jan. 24, 1978.
 
 Richard A. Silver, Stamford, Conn. (David S. Golub, Stamford, Conn., of counsel), for plaintiffs-appellants.
 J. Daniel Sagarin, Bridgeport, Conn. (Michael Shapiro, Schless, Sagarin, Neigher & Simon, Bridgeport, Conn., Richard Berkowitz, Berkowitz & Balbirer, Westport, Conn., of counsel), for defendants-appellees Green, Meyers, Bradley and Westport Transit District.
 Glenn F. Wasserman, Atty. Advisor, Urban Mass Transportation Administration, Washington, D. C. (Robert W. Batchelder, Asst. Chief Counsel, Urban Mass Transportation Administration, Washington, D. C., Richard Blumenthal, U. S. Atty., District of Conn., Diana Garfield, Asst. U. S. Atty., District of Connecticut, New Haven, Conn., of counsel), for defendant-appellee Secretary of Transportation.
 Before FRIENDLY, GURFEIN and MESKILL, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 The purpose of the Urban Mass Transportation Act of 1964, as amended, 49 U.S.C. § 1601 et seq. ("the Act"), is to improve urban mass transportation systems. 49 U.S.C. § 1601(b).[1] It seeks to advance this purpose by providing, among other things, financial assistance to mass transportation projects of various kinds, including so-called "demonstration projects." 49 U.S.C. § 1605(a).[2] The instant case is one in which a federally funded demonstration project to be conducted by a public mass transportation company has encountered the opposition of an existing private transportation company which, for competitive reasons, has sought to enjoin the implementation of the project.
 
 
 2
 Defendant-appellee Westport Transit District ("Transit District") is a government entity formed by Westport, Connecticut in 1969 to organize, coordinate and provide mass transportation services in Westport. Conn.Gen.Stat. § 7-273b. Its appointed directors are defendants-appellees Paul R. Green, John E. Meyers and Richard Bradley. In April, 1975, the Transit District applied to the federal Urban Mass Transportation Administration ("UMTA") for a $25,000 grant to study the possibility of developing an integrated and coordinated transportation system for the community. The study had two immediate goals: first, to develop a plan for a complete transportation system that would utilize and coordinate existing and potential transportation services; second, to design a demonstration project to implement and experiment with various aspects of the plan. Such studies are eligible for funding under 49 U.S.C. § 1605(c). On June 26, 1975, the Administrator of the UMTA, to whom the powers of the Secretary of Transportation under the Act have been delegated, 49 C.F.R. § 1.51, approved the study grant. The study was conducted, and a demonstration project was proposed. Early in 1976, the Transit District applied for a grant of roughly $610,000 to implement the project. In July of 1976, the Administrator approved a grant for a two-year project. The basic question on this appeal is whether certain of the Act's procedural requirements had to be complied with prior to the Administrator's approval of the two-year implementation grant.
 
 
 3
 Plaintiff-appellant Westport Taxi Service, Inc. ("Westport Taxi") is a small taxi company owned by two brothers, plaintiffs-appellants Michael and Anthony Gilbertie. It operates under a certificate of public convenience and necessity from the Connecticut Public Utilities Control Authority ("PUCA"). Conn.Gen.Stat. § 16-320. The type of service offered by Westport Taxi is known as "exclusive-ride" taxi service and is governed by PUCA regulation § 16-319-15, which requires that the consent of the first person to hire a taxicab be obtained before the taxi may take on additional riders. Westport Taxi's "fleet" consists of five aging taxicabs; its financial condition is precarious.
 
 
 4
 The Transit District's demonstration project will provide several new types of services. Principal among them will be a "shared-ride" taxi service provided with eleven new twelve-passenger vans that will compete directly with Westport Taxi. Plaintiffs fear that their taxi company will be destroyed if the project goes forward. Given their present financial condition, these fears appear to be well-founded.
 
 
 5
 Plaintiffs brought this action to enjoin the Secretary of Transportation from funding the project and the Transit District from implementing it. They argue that the Transit District failed to comply with two subsections of the Act. The first is 49 U.S.C. § 1602(d), which provides:
 
 
 6
 Any application for a grant or loan under this chapter to finance the acquisition, construction, reconstruction, or improvement of facilities or equipment which will substantially affect a community or its mass transportation service shall include a certification that the applicant
 
 
 7
 (1) has afforded an adequate opportunity for public hearings pursuant to adequate prior notice, and has held such hearings unless no one with a significant economic, social, or environmental interest in the matter requests a hearing;
 
 
 8
 (2) has considered the economic and social effects of the project and its impact on the environment; and
 
 
 9
 (3) has found that the project is consistent with official plans for the comprehensive development of the urban area.
 
 
 10
 Notice of any hearings under this subsection shall include a concise statement of the proposed project, and shall be published in a newspaper of general circulation in the geographic area to be served. If hearings have been held, a copy of the transcript of the hearings shall be submitted with the application.
 
 
 11
 The Transit District concedes that the certification required by this subsection was not included in its application. The second is 49 U.S.C. § 1602(e), which provides:
 
 
 12
 No financial assistance shall be provided under this chapter to any State or local public body or agency thereof for the purpose, directly or indirectly, of acquiring any interest in, or purchasing any facilities or other property of, a private mass transportation company, or for the purpose of constructing, improving, or reconstructing any facilities or other property acquired (after July 9, 1964) from any such company, or for the purpose of providing by contract or otherwise for the operation of mass transportation facilities or equipment in competition with, or supplementary to, the service provided by an existing mass transportation company, unless (1) the Secretary finds that such assistance is essential to a program, proposed or under active preparation, for a unified or officially coordinated urban transportation system as part of the comprehensively planned development of the urban area, (2) the Secretary finds that such program, to the maximum extent feasible, provides for the participation of private mass transportation companies, (3) just and adequate compensation will be paid to such companies for acquisition of their franchises or property to the extent required by applicable State or local laws, and (4) the Secretary of Labor certifies that such assistance complies with the requirements of section 1609(c) of this title.
 
 
 13
 All of plaintiffs' claims were rejected by the district court.[3]
 
 
 14
 STANDING.
 
 
 15
 The district court held that the plaintiffs have standing to maintain this suit. We agree. Plaintiffs are "likely to be financially injured," F.C.C. v. Sanders Brothers Radio Station, 309 U.S. 470, 477, 60 S.Ct. 693, 84 L.Ed. 869 (1940), quoted in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), by the approval of the grants and thus satisfy the case or controversy requirement of Article III of the Constitution. Plaintiffs also satisfy the nonconstitutional "zone of interests" test for standing. See Association of Data Processing Service Organizations, Inc. v. Camp, supra, 397 U.S. at 153, 90 S.Ct. 827. They fall within the "zone of interests" protected by § 1602(d) because they are members of the Westport "community"; they are "arguably within the zone of interests" protected by § 1602(e) because they are, at least arguably, a "mass transportation company."
 
 
 16
 SUBSECTION (d).
 
 
 17
 The certification requirement of § 1602(d) applies to "(a)ny application for a grant . . . under this Act to finance the acquisition, construction, reconstruction, or improvement of facilities or equipment which will substantially affect a community or its mass transportation service. . . ." Urban Mass Transportation Assistance Act of 1970, Pub.L. No. 91-453, § 2(d), 84 Stat. 962, 964 (1970). The defendants contend and the district court held that § 1602(d) need not be complied with here because the Transit District's project is a demonstration project under § 1605, a type of project to which § 1602 assertedly does not apply. According to their analysis, the Act establishes discrete, mutually exclusive categories of projects, each of which is governed by a different section of the Act. Under this view, a demonstration project under § 1605 need not comply with any other section of the Act.
 
 
 18
 We read the Act differently. By its own terms, § 1602(d) applies to "(a)ny application . . . under this Act" for a grant which, if implemented, meets certain objective criteria. This language suggests that the categories overlap a demonstration project is exempt from sections other than § 1605 only if its nature is such that it does not meet the criteria those sections establish. Thus, a demonstration project may or may not involve "the acquisition . . . of facilities . . . which will substantially affect a community or its mass transportation service." If it does not, then § 1602(d) need not be complied with; if it does, however, the requirements of that subsection cannot be avoided merely because the project is a demonstration. We are confident that Congress meant what it said when it wrote "(a)ny application . . . under this Act" and set forth objective criteria. It intended each project to be treated according to its impact, not just its type.
 
 
 19
 Under our reading of the statute, therefore, the impact of each proposed mass transportation project upon its community must be evaluated. The trial judge found that the Transit District's project "is a demonstration project only and does not involve the more significant commitment of resources and more substantial effect on the community necessary to bring the hearing and certification requirements of § 1602(d) into play" (footnote omitted). Because this finding is based on the erroneous view that § 1602 and § 1605 are mutually exclusive, it cannot stand. It is clear that this demonstration project involves "the acquisition, construction, reconstruction, or improvement of facilities or equipment" and "will substantially affect" Westport and its mass transportation service. Indeed, it is difficult to imagine how the implementation of a $600,000 project involving the purchase of eleven twelve-passenger vans, at a cost of over $150,000, in a town of less than 30,000 inhabitants could fail to have a substantial effect on the community and its mass transportation service. In fact, that appears to have been the very intent of those who designed the project. Appellees try to minimize the impact of the project by pointing out that it is merely a two-year demonstration. We find this approach unpersuasive. The demonstration may well be the start of a long-term program. The Transit District's new vans are not going to evaporate after two years; after they are demonstrated, they will likely become a permanent part of Westport's mass transportation service. Furthermore, two years can be a very long time for some citizens of Westport. Given the present state of plaintiffs' financial condition, it appears unlikely that it could survive this two-year program. It cannot be denied that the elimination of one of the two independent, traditional, exclusive-ride taxi services in Westport, together with the substitution of a new $600,000 project, would constitute a "substantial" effect on the community or mass transportation of Westport. Accordingly, § 1602(d) must be complied with. We note, however, that on the facts of this case compliance should be a relatively simple matter. The hearings required by § 1602(d)(1) have already been held, and the economic, social and environmental[4] impact of the project has been studied, as required by § 1602(d)(2), in great depth; the project is clearly "consistent with official plans for the comprehensive development of the urban area," § 1602(d)(3), for it is an integral part of Westport's own comprehensive mass transportation plan. Thus, § 1602(d) can be satisfied merely by amending the grant application so as to include the requisite certification under § 1602(d).
 
 
 20
 SUBSECTION (e).
 
 
 21
 The analysis applicable to § 1602(d) is also applicable to § 1602(e). Like subsection (d), subsection (e) applies to all "financial assistance . . . provided under this Act." Urban Mass Transportation Act of 1964, Pub.L. No. 88-365, § 3(c), 78 Stat. 302, 303 (1964). However, only a "mass transportation company" may claim the protection of subsection (e). We have already held that, for standing purposes, Westport Taxi is "arguably within the zone of interests" protected by this subsection because it arguably fits the definition of a "mass transportation company." We must now decide, on the merits, whether it is in fact a "mass transportation company."
 
 
 22
 As originally enacted, the definition of "mass transportation" found in 49 U.S.C. § 1608(c)(5) covered "transportation by bus or rail or other conveyance, either publicly or privately owned, serving the general public (but not including school buses or charter or sightseeing service) and moving over prescribed routes." Pub.L. No. 88-365, § 9(d)(5), 78 Stat. 302, 307 (1964). This definition clearly excluded traditional private taxi service, for taxicabs do not "move over prescribed routes." This definition proved too limited, however, because it excluded innovative, new "paratransit" systems, such as "dial-a-ride" or "minibus" services, which have more flexible routes. In the Housing and Urban Development Act of 1968, Pub.L. No. 90-448, § 702, 82 Stat. 476, 535 (1968), the definition of "mass transportation" was changed. It now covers "transportation by bus, rail, or other conveyance, either publicly or privately owned, which provides to the public general or special service (but not including school buses or charter or sightseeing service) on a regular and continuing basis" (emphasis added). On its face, the definition is now broad enough to cover transportation service provided by means of a tandem bicycle, as long as it is provided "on a regular and continuing basis." In construing the definition, however, we must remember "that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.) (L. Hand, J.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). The purpose of the change in the definition of "mass transportation" was "to allow greater flexibility in developing and applying new concepts and systems in urban mass transportation programs." S.Rep.No.90-1123, 90th Cong., 2d Sess. 76-77; see H.R.Rep.No.1585, 90th Cong., 2d Sess. 65-66, reprinted in (1968) U.S.Code Cong. & Admin.News, pp. 2873, 2940-41. Congress does not appear to have intended to include conventional taxi service within the changed definition, for such service cannot by any stretch of the imagination be considered a "new" concept or system.
 
 
 23
 In construing the definition of "mass transportation" we also look to the interpretation given it by the UMTA. Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Charles F. Bingman, Acting Urban Mass Transportation Administrator, submitted to the district court an affidavit and supporting documentation in which the UMTA's interpretation of the Act is described as follows:
 
 
 24
 UMTA has consistently included within (the) definition (of "mass transportation") any form of collective transportation service which is regularly available to the public; i. e., any service which cannot be reserved for the private and exclusive use of particular individuals or private groups. . . . Hence, fixed-route bus or rail services and paratransit services such as dial-a-ride, jitney, shared-ride taxi, neighborhood transit, subscription bus service and other types of shared-ride transportation services which are available to the public or to special categories of users (such as elderly and handicapped persons) on a regular basis are considered by UMTA to be "mass transportation services." Services which can be reserved for the exclusive use of individuals or private groups, either by the operator or the first patron's refusal to permit others to be picked up, such as exclusive-ride taxi service, charter services, sightseeing services, employer van-pool programs, car rental services, for-hire limousines and private ambulance services are not deemed to be "mass transportation" services for purposes of the UMT Act. (emphasis added).
 
 
 25
 See also 41 Fed.Reg. 46412-13. In view of this administrative interpretation and practice,[5] and in view of the legislative history of the 1968 amendment, we hold that a company such as Westport Taxi, operating five taxicabs under a regulation which provides that the consent of the first rider to hire a taxi must be obtained before others may be carried, is not a "mass transportation company" entitled to the protections afforded by § 1602(e).
 
 
 26
 CONCLUSION.
 
 
 27
 In view of our decision that there has been a failure to comply with § 1602(d), the judgment of the district court is reversed in part and the case is remanded with instructions to enter an order enjoining any further expenditure of federal funds on the demonstration project and granting such other relief as may be necessary pending the amendment of the Transit District's application so as to contain the requisite certification and pending the approval of the amended application by the UMTA Administrator. The decision below is in all other respects affirmed. The mandate shall issue forthwith. No costs.
 
 
 28
 Affirmed in part, reversed in part and remanded with instructions.
 
 
 
 [1]
 49 U.S.C. § 1601 provides as follows:
 Declaration of findings and purposes
 (a) The Congress finds
 (1) that the predominant part of the Nation's population is located in its rapidly expanding metropolitan and other urban areas, which generally cross the boundary lines of local jurisdictions and often extend into two or more States;
 (2) that the welfare and vitality of urban areas, the satisfactory movement of people and goods within such areas, and the effectiveness of housing, urban renewal, highway, and other federally aided programs are being jeopardized by the deterioration or inadequate provision of urban transportation facilities and services, the intensification of traffic congestion, and the lack of coordinated transportation and other development planning on a comprehensive and continuing basis; and
 (3) that Federal financial assistance for the development of efficient and coordinated mass transportation systems is essential to the solution of these urban problems.
 (b) The purposes of this chapter are
 (1) to assist in the development of improved mass transportation facilities, equipment, techniques, and methods, with the cooperation of mass transportation companies both public and private;
 (2) to encourage the planning and establishment of areawide urban mass transportation systems needed for economical and desirable urban development, with the cooperation of mass transportation companies both public and private; and
 (3) to provide assistance to State and local governments and their instrumentalities in financing such systems, to be operated by public or private mass transportation companies as determined by local needs.
 
 
 [2]
 49 U.S.C. § 1605(a) provides as follows:
 The Secretary is authorized to undertake research, development, and demonstration projects in all phases of urban mass transportation (including the development, testing, and demonstration of new facilities, equipment, techniques, and methods) which he determines will assist in the reduction of urban transportation needs, the improvement of mass transportation service, or the contribution of such service toward meeting total urban transportation needs at minimum cost. He may undertake such projects independently or by grant or contract (including working agreements with other Federal departments and agencies). In carrying out the provisions of this section, the Secretary is authorized to request and receive such information or data as he deems appropriate from public or private sources.
 
 
 [3]
 The plaintiffs argued in the district court, as they have in this Court, that the destruction of their business that will result if the project is implemented will amount to a "taking" without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution. It is well established that there is no right to be free from governmental competition. See Tennessee Elec. Power Co. v. T.V.A., 306 U.S. 118, 138-39, 59 S.Ct. 366, 83 L.Ed. 543 (1939). Plaintiffs' argument based on an alleged statutory right under 49 U.S.C. § 1602 to be free from competition in the absence of compliance with the requirements of that section is evaluated in our discussion of subsections (d) and (e) of that section
 
 
 [4]
 The necessity of compliance with § 1602(d) triggers the requirements of § 1610(c). That section was complied with at the time the Transit District's grant was approved when a finding was made that "the proposed grant will not have significant impact on the quality of the environment."
 
 
 [5]
 The record contains evidence of two examples of UMTA funding of private taxicab companies. Both, however, involve specialized service designed to assist the elderly and handicapped, on whose behalf Congress has directed "that special efforts shall be made." 49 U.S.C. § 1612. Thus, we do not view such funding as being a significant exception to the UMTA's policy or as detracting from the persuasive force of the UMTA's interpretation. Compare Gilbert v. General Electric Co., 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 858 n. 25, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975)