David B. COHEN et al., Plaintiffs,
Appellants,

v.

MASSACHUSETTS BAY TRANSPOR-
TATION AUTHORITY et al.,
Defendants, Appellees.

No. 81–1211.

United States Court of Appeals,
First Circuit.

Argued April 8, 1981.

Decided April 21, 1981.

Peter Koff, Boston, Mass., for plaintiffs, appellants.

Joseph H. Elcock, Gen. Counsel, Boston, Mass., with whom Ronald G. Busconi, Asst. Gen. Counsel, Boston, Mass., was on brief, for defendant, appellee Massachusetts Bay Transportation Authority.

Richard J. Bacigalupo, Atty., U. S. Dept. of Transportation, Washington, D. C., with whom Trudy B. Levy, Acting Asst. Chief Counsel, U. S. Dept. of Transportation, Washington, D. C., Edward F. Harrington, U. S. Atty., and Donald R. Anderson, Asst. U. S. Atty., Boston, Mass., were on brief, for Federal defendants, appellees.

Before ALDRICH, BOWNES and BREYER, Circuit Judges.

ALDRICH, Senior Circuit Judge.

This is a representative action brought by four members of the general public, riders of the "T", the rapid transit, bus, and general transit system serving metropolitan Boston operated by the principal defendant, Massachusetts Bay Transportation Authority (MBTA), a political subdivision of the Commonwealth.[1] Other defendants are the MBTA's Chairman, the Secretary of the United States Department of Transportation, the Administrator of the Urban Mass Transportation Administration (UMTA), and UMTA's designate Regional Director for the Boston region. The suit's initial purpose was to prevent broad service cuts announced by the MBTA (in final form on March 31, 1981) from taking effect until there had been further public hearings and consideration given to matters allegedly neglected.

The complaint was filed on March 20. Plaintiffs unsuccessfully sought a temporary restraining order and a preliminary injunction from the district court, and an order or stay from us pending appeal. As a result of these failures the cuts went into effect, commencing April 4. We expedited the appeal, and after the hearing on April 8 affirmed the denial of the injunction without opinion, but retained jurisdiction for consideration of possible further relief. We now conclude that none is warranted.

The basis of the suit is plaintiffs' claim that the MBTA failed adequately to perform its obligations under an agreement entered into with the UMTA. This, in terms, followed the provisions of section 5(i)(3), 49 U.S.C. § 1604(i)(3) of the Urban Mass Transportation Act of 1964, 49 U.S.C. § 1601 et seq., hereinafter the UMT Act or act, as a required condition for the granting of a federal Operating Assistance Grant. Funds were last received in 1980, but whether fully consumed or not does not appear. The MBTA concedes that it plans to seek further funds in 1981. We consider the agreement fully viable. Section 5(i)(3) required the MBTA to give

"assurances satisfactory to the Secretary [that it] will not substantially change any service except (A) after having held public hearings or having afforded an adequate opportunity for such hearings, after adequate public notice, (B) after having given proper consideration to views and comments expressed in such hearings, and (C) after having given consideration to the effect on energy conservation, and the economic, environmental, and social impact of the change in such fare or such service."

Regulations issued under the act, so far as pertinent, stated that the notice of the public hearings should contain "a description of the contemplated service changes." 45 Fed. Reg. 26,298, 26,301 (1980) (to be codified in 49 C.F.R. § 635.9(c)(1)).

On December 30, 1980 the MBTA directors considered the actions they must take as a result of the controlling 1981 budget announced by the MBTA Advisory Board the preceding week in an amount some 57 million dollars less than requested, and 7 million dollars less than the budget which had proved substantially insufficient for calendar year 1980. After allowance for economy measures not presently before us, the shortfall was pared down to 23

1. Original plaintiffs were David B. Cohen, a member of the Massachusetts House of Representatives; George A. Bachrach, a state Senator; Richard C. Innes, an officer of the Greater Boston Group Sierra Club, and Ernest Loewenstein, a self-styled regular user. These were later joined by the Association for Public Transportation, a Mass.Gen. Laws Chapter 180 corporation, and Citizens for Participation in Political Action, a voluntary unincorporated association.

million dollars. Since it is unlawful to exceed the budget, *MBTA Advisory Board v. MBTA*, —— Mass. ——, 1981 Mass.Adv.Sh. 403, 417 N.E.2d 7, to the point that a shutdown well before the end of this year would be inescapable without changes, or additional funds, the directors concluded, in light of the shortfall, that it was advisable to consider an early reduction of services. Thereafter, on February 13, they published extensive newspaper notices listing the services proposed to be affected, by being "discontinued," by "frequency reduction," or by elimination of service on Sundays, or during off-peak hours, or beyond stated geographical limits.[2] Following this listing was an announcement that four public hearings would be held on March 16, 1981, at certain specified hours and places, and that more detailed information would be provided at the hearings.

Present at each of the March 16 hearings were MBTA representatives, one of whom, in advance of a verbatim transcription, took notes and made summaries of the general nature of the comments. These summaries were forwarded to the MBTA directors before their vote, and were part of the district court record. The vote, taken March 31, 1981, recited that the testimony adduced at the hearings had been reviewed, and that "despite the adverse effects on the public resulting in hardship and substantial inconvenience and the adverse impact upon the energy, economy, environment and social well being," the Board's legal obligation to live within its budget mandated implementation of the cuts.

As the transcripts are not before us we cannot finally evaluate plaintiffs' generalized assertion that the summaries were not adequate or meaningful, but an extraordinary amount of substance was omitted if they are materially incomplete. Most of the comments, as summarized, focused on the hardships imposed by the cuts and, somewhat less so, on who was to blame. Such suggestions as appear, range from

that of a state senator, echoed by a Union representative, that the MBTA "carry on the service substantially as it exists and face the issue of exhaustion of funds when it arises," to undetailed admonitions to "cut the fat" and "live within the budget."

The most specific proposals came from the MBTA's former director, Robert Kiley, whose suggestion that all MBTA employees take an 8% to 10% cut in pay was recorded in the summaries, along with the predictable Union opposition. Kiley also offered, by affidavit, his opinion

"that the MBTA could reduce its remaining 1981 expenditures by approximately $7,250,000 *without reducing service* simply by reducing the following costs in four areas: (1) absenteeism ($3,000,000); (2) replacement of employees lost through attrition ($750,000); (3) overtime ($2,000,-000); and (4) the pool of workers covering absent employees, the so-called 'cover list' ($1,500,000)."

Opinions may differ as to the tractability of the problems identified, but the proposed 7 million dollar saving still falls considerably short of the 23 million dollar shortfall. In short, if there is a "quick fix" for the MBTA's problems, it does not appear on this record.

In an extensive opinion the district court found that plaintiffs had not met the familiar requirements for the granting of a preliminary injunction, namely, that they would suffer irreparable injury if the injunction were not granted; that the injury to them outweighs the anticipated injury to the MBTA should the injunction issue; that they have a reasonable likelihood of success, and that granting the injunction would not be against the public interest. *See Planned Parenthood League of Massachusetts v. Bellotti*, 1 Cir. 1981, 641 F.2d 1006, 1009.

The court concentrated its attention on the likelihood of success, but added that the issuance of an injunction "will do great

---

**2.** According to plaintiffs' summary of the cuts implemented on April 4, services on some 180, or virtually all, bus routes were reduced in frequency and hours of operation; all services were discontinued on 21 bus routes, and Sunday services cancelled on 30 more. Sunday rapid transit service was reduced by 2½ hours.

harm to the defendant MBTA." We follow the same course, although our reasons for doubting success are not all the same as those of the district court.

■ Plaintiffs posited their right to sue primarily on the ground that this was implicit in the terms of section 5(i)(3), the regulations thereunder, and the MBTA's acceptance of the grant agreement. Their other three grounds were fallback positions. Since we agree with the first, we need go no further.[3] Plaintiffs' right to sue follows almost directly from our decision in *Local Division No. 714, Amalgamated Transit Union, AFL–CIO v. Greater Portland Transit District*, 1 Cir., 1978, 589 F.2d 1. Defendants seek to distinguish that case chiefly by arguing that a member of the riding public is not "one of the class for whose *especial* benefit the statute was enacted," 589 F.2d at 14, quoting *Cort v. Ash*, 1975, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26. Granted, in the present action the riding public comprises thousands of potential plaintiffs, as opposed to the single union in *Greater Portland*.[4] We do not, however, read the "especial benefit" prong of the *Cort* test as embodying a numerical inquiry, but only as requiring that the plaintiff and his class be the intended, primary beneficiaries. It cannot be gainsaid that the purpose of the requirement of a hearing before fare or substantial service changes is to benefit the consuming public by promoting informed decision-making. The fact that the benefitted class is a large one does not mean that there is none, or that plaintiffs are outside it. Once this point is made, this case is indistinguishable from *Greater Portland*. We see no need to deal with defendants' further objections, such as the fact that other sections of the act, *e. g.*, sections 1604(m), 1606, 1612 and 1615, are directed to more limited classes.

■ At the same time that we construe the act as giving legally enforceable rights to the public, we must interpret those rights so as to give the statute practical effect. The sheer number of concerned users must necessarily dilute individual interests. The hearing and proper consideration of the views of the whole riding public calls for discretion in choosing the method and, very possibly, a broader brush than may satisfy some. It cannot be thought that every rider who wishes to be heard, and to have his or her views "properly considered" by the Board, can call upon the federal court to police the process, and to review it to the last minutiae. Our maximum function must be to inquire as to the general adequacy of the hearings,[5] and second, whether the views expressed were adequately transmitted to the Board and were before it at the time of its vote. In both inquiries the focus is on the reasonableness under the circumstances of the means chosen to accomplish these ends.[6] These circumstances include

---

3. Plaintiffs also asserted claims under 42 U.S.C. § 1983, *see Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Id.*, at 37, 100 S.Ct. at 2521 (Powell, J., dissenting), under Mass.G.L. c. 161A § 5(a), and, against the federal defendants, for violation of their supposed duty under various sections "to take appropriate action to protect the public" from violations of the UMT Act. The first and last are mooted by our holding that plaintiffs may prosecute their claim under the UMT Act and by our holding on the merits of that claim, respectively. As for the state claim, if a private right of action is to be fashioned in plaintiffs' favor from section 5(a)'s general admonition to the MBTA to act "in the public interest . . .", we do not think we are the appropriate court to do so.

4. We may suspect, however, that as a practical matter the present suit will end the controversy. Since only general, unitary injunctive relief is (or, we think, could be) called for, a judgment in plaintiffs' favor would leave no incentive for others to pursue the matter further. Should the action be terminated adversely to plaintiffs, *stare decisis* may be just as inhibiting as *res judicata*.

5. Having in mind, also, that, as appears from the record, and representations of counsel, there have been other means availed of for public input. *Cf. Main-Amherst Business Ass'n, Inc. v. Adams*, W.D.N.Y., 1978, 461 F.Supp. 1077, 1084.

6. Plaintiffs' proposed analogy to the National Environmental Policy Act of 1969 is instructive. A comparison of the UMT Act's "hearing and notice" provision in section 5(i)(3) with the much more detailed requirements of NEPA, 42 U.S.C. § 4332, suggests that while there is a common purpose—informed consideration of

the complexity of the proposed changes, the necessity for prompt action, the putative size of the audience and the number of speakers. On the facts of this case plaintiffs have a singularly difficult row to hoe. We may deal briefly with their objections.

Plaintiffs first complain that the notices of the hearings, in listing changes in individual bus route services simply as "frequency reduction," and not specifying the exact reduction until the time of the hearings, unduly limited the efficacy of individual complainants.[7] We can only think that a requirement that every change be worked out, and announced, in advance to the last detail in an emergency such as this would serve to drown the baby rather than give it a bath. While plaintiffs claim that not being fully informed until the time of the hearing prevented their making an intelligent presentation, we may doubt that the district court will find, indeed, even could find, prejudice from the lack of greater specificity in the notice.

Plaintiffs' complaint that the MBTA directors were not personally present at the hearings, and that the summaries furnished them by their representatives could not be sufficiently meaningful to have permitted them to afford adequate consideration, we have already dealt with. To it, however, they join the familiar argument that the directors having announced in advance what they proposed to do, "the subsequent hearings were little more than a hollow exercise." Although the necessity for taking further advance procedures, particular-

ly the affording of drivers their "pick" of runs, puts more flesh on this tired skeleton than usually exists in the heads-I-win-tails-you-lose attack on a statutory procedure that requires the giving of notice of a proposed action in advance of the hearing, it is not enough to give it prima facie life.[8]

Finally, although the directors recited in their vote that they had given attention to the social, economic and environmental consequences of substantial service reductions, plaintiffs would have it that the plaintiffs must prevail on this issue in the absence of further evidence. Indeed, throughout their brief, plaintiffs take the position that the court was bound to accept the correctness of their factual contentions in the absence of rebuttal evidence. We do not agree. While a court, in the exercise of its discretion, may take a verified complaint, affidavits, or even, in some circumstances, representations of counsel, *see* 7 Moore's Federal Practice ¶ 65.04[3] (1980), this is a long way from saying that it has to do so. This is particularly so with respect to conclusory allegations manifestly outside the pleader's or affiant's personal knowledge, or even his reliable hearsay knowledge.[9] *Cf. Marshall Durbin Farms, Inc. v. National Farmers Organization, Inc.,* 5 Cir., 1971, 446 F.2d 353, 357. Plaintiffs have not met the heavy burden of overcoming the court's conclusions that

"nothing has been presented to me that satisfies me there is a reasonable prospect of establishing a refusal on the part of MBTA to consider views propounded by

---

the consequences of proposed action—a different level of formality was contemplated.

7. It is true that the preamble to the regulations, although not the regulations themselves, so indicates.

"For example, if the service change provides that a bus will run every 30 minutes rather than every 15 minutes then this fact would appear in the notice". 45 Fed.Reg. 26,298, 26,300 (1980).

It is also true that such listing of the present frequency changes, which varied for each of some 180 routes and in seven different time periods (listed as AM, Midday, PM, 8–10, Late Eve., Sat., Sun.) would have been considerably more voluminous than the example suggests.

8. Plaintiffs' argument that the directors were committed by the "pick" prior to the hearing is belied by the fact that a postponement of the initially proposed date was made after the hearings in order to effect a new pick as a result of changes that were made.

9. *E. g.,* see ¶ 56 of the amended complaint, that "[t]he MBTA has violated the assurances … by failing to consider the views and comments expressed in [the March 16] hearing; and by failing to consider the effects of [the service] reductions on energy conservation and the economic, environmental, and social impacts thereof."

members of the public at the hearing in March. Nor, has anything been submitted which shows reasonable prospect of establishing that the MBTA did not consider the potential effect of the desired reductions on energy conservation, economic, environmental and social matters."

This case, as do many such, calls for consideration of the factual background. It is a matter both of evidence, and of common knowledge, that the MBTA faces substantial financial difficulties, with anticipated expenses considerably in excess of available funds. The service cuts were proposed as a way of reducing the anticipated deficit. Plaintiffs, so far as appears, proposed no viable alternatives. The offered predictions of certain legislative leaders that the legislature would come to the MBTA's rescue, we may take judicial notice from past history, were nothing to be counted on. See, in general, *MBTA Advisory Board v. MBTA*, —— Mass. ——, 1981 Mass.Adv.Sh. 403, 417 N.E.2d 7. Rather, this case may have looked to the directors as another example of what the courts themselves are now seeing frequently in the wake of Proposition 2½, another King Canute exercise in the face of an inexorable tide.[10] The district court was warranted in concluding that a postponement of the cuts until after a further hearing, disturbing as they certainly are to the public, would not likely result in, or warrant, any changes the benefits of which would outweigh the injury that a postponement would occasion.

*Affirmed.*

---

**10.** This comparison is perhaps ill chosen, for what is being witnessed is the supply of funds running out rather than the tide flowing in, but it is equally true that the King could not have avoided being left high and dry.