Leonard P. STAVISKY and Joseph Fierstein, Plaintiffs,

v.

METROPOLITAN TRANSPORTATION AUTHORITY, Richard Ravitch, New York City Transit Authority, John D. Simpson, United States Department of Transportation, Andrew L. Lewis, Richard S. Page and Alfred A. Delli Bovi, Defendants.

No. CV 82–0228.

United States District Court, E. D. New York.

March 8, 1982.

Mackell & Robertson, Forest Hills, N. Y. by James M. Wright, for plaintiffs.

E. R. Korman, U. S. Atty., E. D. N. Y. by Marilyn Go, Asst. U. S. Atty., Brooklyn, N. Y. (Trudy B. Levy, and Richard J. Bacigalupo, Urban Mass Transp. Admn., U. S. Dept. of Transp., Washington, D. C., of counsel), for defendants.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Plaintiffs, Assemblyman Leonard Stavisky and Joseph Fierstein, by order to show cause seek a preliminary injunction [1] enjoining the defendants, Metropolitan Transportation Authority and New York City Transit Authority (referred to as the "MTA" and "NYCTA" or collectively as the "local defendants"), from continuing repair operations that necessitate the suspension of service on the IRT # 7 Flushing Line (Flushing line) until defendants conduct public hearings allegedly required by section 5(i) of the Urban Mass Transportation Act

1. Plaintiffs unsuccessfully sought a temporary restraining order.

(UMT Act), 49 U.S.C. § 1604(i) (Supp. III 1979).

Defendants, United States Department of Transportation Andrew Lewis, Arthur Teele[2] and Alfred Delli Bovi (collectively referred to as the "Government" or "Federal defendants"), move to dismiss on the grounds that section 5(i) does not impliedly or otherwise confer upon plaintiffs a private right of action and that plaintiffs lack standing. All of the defendants join in opposition to the plaintiffs' motion for a preliminary injunction.

For the reasons set forth below, the Government's motion to dismiss and plaintiffs' motion for a preliminary injunction are denied.

I

The subway line at issue here runs from Main Street, Flushing, Queens, to Times Square. On January 31, 1982, the NYCTA began maintenance and repair work on the line between Grand Central Station and the Vernon-Jackson station necessitating that service be suspended between Times Square and Vernon-Jackson daily from midnight until 5 A.M.[3] It is anticipated that this service suspension will be in effect for approximately one year. Normal service is otherwise available.

The result of the service suspension is that Flushing line riders seeking to go into Manhattan between midnight and 5 A.M. must change at the Queensboro Plaza station for the BMT line. Naturally those persons going from Manhattan into Queens during those hours must, if they wish to avail themselves of the Flushing line, pick up that train at Queensboro Plaza. The defendants are also providing additional shuttle bus service between Times Square and the Vernon-Jackson station.

2. Plaintiffs incorrectly named Richard Page as the administrator of the Urban Mass Transportation Administration.

3. Suspension of service on Saturday apparently lasts from 1 A.M. to 6 A.M. and on Sundays from 1 A.M. to 7 A.M.

4. Section 635.2(c) of Title 49 of the Code of Federal Regulations, which defines a transit route mile, provides in pertinent part:

The work currently being conducted on 2.05 transit route miles[4] of the Flushing line is funded in part by federal monies granted under the UMT Act and in part by non-federal sources. The local defendants do not dispute that they are bound by the hearing requirements of the UMT Act, but assert that no hearing was required here because this project falls within a regulatory exception to those requirements.

II

Section 5(i) of the UMT Act provides:

(i) Upon submission for approval of a proposed project under this section, the Governor or the designated recipient of the urbanized area shall certify to the Secretary that he or it has conducted public hearings (or has afforded the opportunity for such hearings) and that these hearings included (or were scheduled to include) consideration of the economic and social effects of such project, its impact on the environment, including requirements under the Clean Air Act, the Federal Water Pollution Control Act, and other applicable Federal environmental statutes, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. Such certification shall be accompanied by (1) a report which indicates the consideration given to the economic, social, environmental, and other effects of the proposed project, including, for construction projects, the effects of its location or design, and the consideration given to the various alternatives which were raised during the hearing or which were otherwise considered, (2)

(c) A transit route mile is a distance of one statute mile along a route regularly travelled by transit vehicles while available for the general public to carry passengers. The length of a route is the round trip distance traversed in traveling completely over the route and returning to the starting point to begin another circuit of the route.

49 C.F.R. § 635.2(c) (1981).

upon the Secretary's request, a copy of the transcript of the hearings, and (3) assurances satisfactory to the Secretary that any public mass transportation system receiving financial assistance under such project will not change any fare and will not substantially change any service except (A) after having held public hearings or having afforded an adequate opportunity for such hearings, after adequate public notice, (B) after having given proper consideration to views and comments expressed in such hearings, and (C) after having given consideration to the effect on energy conservation, and the economic, environmental, and social impact of the change in such fare or such service.

49 U.S.C. § 1604(i).

Initially, we note that section 5(i) requires public hearings in two separate instances. A certification that public hearings have been conducted must accompany a submission for section 5 funds. In addition, the certification must contain "assurances" under subsection (3) of section 5(i) that further public hearings will be conducted if the recipient of funds seeks to "change any fare" or "substantially change any service."

The Secretary of the Department of Transportation has promulgated a regulation specifying when a hearing is required under section 5(i)(3) of the UMT Act. That regulation provides in pertinent part:

> (a) Except as provided elsewhere in this section, a hearing required by section 5(i)(3) of the Act must be held when—
>
> (1) There is a change in any fare;
>
> (2) There is any change in service of—
>
> (i) 25 percent or more of the number of transit route miles of a route; or

(ii) 25 percent or more of the number of transit revenue vehicle miles of a route computed on a daily basis for the day of the week for which the change is made; or

(3) A new transit route is established.

49 C.F.R. § 635.7 (1981).

■ There is no dispute here as to whether the local defendants afforded an opportunity for public hearings required by section 5(i) in the course of applying for section 5 operating assistance. At issue is whether the defendants, recipients of section 5 funds who have given the required assurances to the Secretary of Transportation under subsection (3) were required to conduct a public hearing under that subsection prior to the temporary suspension of service on the Flushing line.[5] In other words, we are asked by plaintiffs to determine whether the suspension of service constituted a "substantial change" in service bringing it within the provision of section 5(i)(3).

### III

The Federal defendants claim that this case should be dismissed because plaintiffs do not have a private right of action under section 5(i)(3) and thus cannot enforce the hearing provision of that section in this Court.

In *Cohen v. Mass. Bay Transp. Auth.*, 647 F.2d 209 (1st Cir. 1981), the First Circuit Court of Appeals found a private right of action under 5(i)(3) and held that the plaintiffs, members of the general public and riders of the transit system, *id.* at 210, could bring an action to enforce the provisions of 5(i)(3). *Id.* at 212.[6]

---

**5.** During the course of oral argument on this motion, it appeared that there was some confusion as to the project for which federal section 5 funds were obtained and the project which has resulted in the service suspension. The former involves operating assistance for the entire transit system; the latter involves a variety of projects funded from both federal and non-federal sources. The attorney for the local defendants has represented that the service suspension is necessitated solely by the work

funded from local sources. This does not alter the fact that compliance with section 5(i) is required of the defendants.

**6.** The Fifth Circuit has entertained an action in which plaintiffs, the City of Atlanta and its mayor acting in both his official and individual capacities, have challenged a lack of compliance with section 5(i)(3). *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 506 F.Supp. 883 (N.D.Ga.1980), *aff'd*, 636 F.2d 1084 (5th Cir. 1981). The Courts there did not ad-

The Government suggests, however, that *Cohen* should be re-examined in the light of subsequent Supreme Court cases regarding private enforcement of federal statutes. Given the Government's suggestion and the fact that we are not bound by *Cohen,*[7] some discussion of whether section 5(i) confers a private right of action is appropriate here.

To determine whether a private right of action is implied in section 5(i)(3), we must examine that section in light of the criteria set forth by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26.

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," . . . . Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law. (Citations omitted).

The Government argues that section 5(i) is merely a general proscription against certain activities, *see California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Cannon v. University of Chicago,* 441 U.S. 677, 690–93, 99 S.Ct. 1946, 1954–56, 60 L.Ed.2d 560 (1979), and does not inure to the special benefit of a class. A reading of section 5(i) indicates, however, that the statute is clearly intended to protect the interests of the community of transit riders who are affected by the expenditure of section 5 funds or who, under subsection (3), are affected by fare changes or substantial service changes. The statute is not a proscription of activity, but rather serves two other purposes. It creates in the class of transit riders a right to speak at public hearings on transit issues directly affecting them, and imposes upon the recipient of section 5 funds an affirmative duty to incorporate the product of these public hearings in its decision making.[8]

The First Circuit has noted correctly that "the riding public comprises thousands of potential plaintiffs" *Cohen v. Mass. Bay Transp. Auth., supra,* 647 F.2d at 212. Nevertheless, numerosity does not defeat the first *Cort* factor which requires only that "the plaintiff and his class be the intended, primary beneficiaries." *Id.*

The Government attempts to argue that the primary beneficiary of section 5(i)(3) is the Secretary of Transportation and that the assurances are necessary so that the Secretary is assured that hearings will be held. While such an argument makes use of the words in the statute, it is a meaningless explanation of the statute unless one recognizes that the hearings are needed to ensure public input and the assurances are needed to protect the riding public's right to make that input.

The second prong of the *Cort* test requires an examination of the legislative his-

---

dress directly whether plaintiffs could maintain a cause of action under section 5(i)(3) but rather considered the merits of plaintiffs' claim finding compliance with the requirements of that section.

7. We have been unable to locate any decision rendered by the Court of Appeals for this Circuit relating to section 5(i). The Second Circuit has addressed the question of standing to obtain an injunction pending conformance with the provisions of section 3(d) of the UMT Act, 49 U.S.C. § 1602(d). *Westport Taxi Service Inc. v. Adams, cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). The provisions of section 3(d) are strikingly similar, though not identical to the section 5(i) require-

ment that public hearings precede the submission of grant applications. Were we concerned here with the first hearing requirement of section 5(i), rather than the requirement of subsection 5(i)(3), we would consider the issue determined and precluded by *Westport* as we see no valid basis for distinguishing between 49 U.S.C. § 1602(d) and 49 U.S.C. § 1604(i).

8. *See Davis v. United AirLines,* 662 F.2d 120 (2d Cir. 1981) (no private right of action under section 503 of the Vocational Rehabilitation Act of 1973, 29 U.S.C. § 794 which neither "confer[s] an express right upon the handicapped nor impose[s] a direct duty on federal contractors").

tory to determine the possible manifestation of an intent to create or deny a private right of action. The legislative history of this section that has been brought to our attention is not extensive. *See* H.R.Conf. Rep. No. 1797, 95th Cong., 2d Sess. 132–33, *reprinted in* [1978] U.S.Code Cong. & Ad. News 6575, 6746–47; 124 Cong.Rec. H10994–95 (1978). There is nothing in the legislative history that clearly indicates any unequivocal intent to deny a private right of action under section 5(i)(3), *See Cannon v. Univ. of Chicago, supra*, 441 U.S. at 694, 99 S.Ct. at 1956, *quoting Cort v. Ash, supra*, 422 U.S. at 82, 95 S.Ct. at 2090, but it is ambiguous at best. Congresswoman Elizabeth Holtzman, who offered the public hearing amendment stated that with the hearing requirement "the public will be assured of having a voice in the decision to raise fares, shorten hours or cancel routes." 124 Cong.Rec. H10995. She also clearly stated:

> It is my intention that this amendment would require the Secretary, in the grant document, to take appropriate steps to protect the hearing provision. To comply with this amendment, he should provide that the grant could be revoked or payments suspended if hearings were not held and the views expressed and consequences explored not taken into account in arriving at a decision on the proposed change.

*Id.*

We cannot say whether it was intended that the Secretary's mandate to "protect the hearing provision" be exclusive. Were the legislative history clear on this point, we would find it conclusive on this issue. The ambiguity thus leads us to the third part of the *Cort* test, whether a private right of action would be inconsistent with the legislative scheme.

The purposes of the Urban Mass Transportation Act are set forth in 49 U.S.C. §§ 1601 and 1601a. Section 1601a provides in pertinent part: "It is the purpose of this Act to create a partnership which permits the local community, through Federal financial assistance, to exercise the initiative necessary to satisfy its urban mass transportation requirements." 49 U.S.C. § 1601a.

To effect the provisions of section 5(i) in accordance with the purposes of the Act, the Secretary of Transportation has promulgated regulations setting forth sanctions for a fund recipient's failure to comply with assurances given under 5(i)(3).

The regulatory sanctions provide

(a) If a fare change or substantial service change is instituted without the requirements of section 5(i)(3) of the Act being met, the recipient has breached the grant agreement.

(b) When a recipient has breached an agreement because of noncompliance with section 5(i)(3) of the Act, the UMTA Administrator may impose one or more of the following sanctions:

(1) Require that the fare in place prior to the fare change be reinstituted or that the service change be cancelled:

(i) Until there is compliance with section 5(i)(3); or

(ii) For a period of time equal to the period between the fare change or service change and the date of compliance.

(2) Deny approval of the following fiscal year's Section 5 application until there is compliance with Section 5(i)(3).

(3) Suspend all payments under all active Section 5 grants until there is compliance with section 5(i)(3). Under this sanction, the recipient will not suffer a loss of funds but will be unable to receive UMTA Section 5 funds from the date of notification until the date of compliance. Funding after that time can cover the period during which payments were suspended.

(4) Declare all costs incurred during the period of noncompliance with section 5(i)(3) ineligible for Section 5 assistance. 49 C.F.R. § 635.11 (1981).

While the regulations clearly give the Secretary the authority to impose sanctions, we find it significant that both the legislation and regulations are devoid of any administrative scheme for reporting to the

Secretary alleged violations of section 5(i) or for investigating or adjudicating complaints.[9]

■ The fact that the regulatory sanctions may in some instances have an effect substantially identical to the remedy sought by the plaintiffs on this motion for a preliminary injunction, may give rise to some inference that they were intended to be exclusive but is not sufficient to support that inference. In *Cannon v. University of Chicago*, 441 U.S. at 771, 99 S.Ct. at 1965, the Supreme Court stated: "The fact that other provisions of a complex statutory scheme create express remedies has not been accepted as a sufficient reason for refusing to imply an otherwise appropriate remedy under a separate section . . . unless there is other, more convincing, evidence that Congress meant to exclude the remedy." (Citations omitted).

■ Here it appears the remedial scheme is not complex. If anything, it is flawed by its superficial simplicity in its failure, as we noted above, to provide even minimally a mechanism for public complaints of violations. Where a complex statutory scheme cannot in itself defeat the creation of an implied right to action, we do not see how an inadequately simple scheme could accomplish this, particularly in light of the fact that there is no "other more convincing evidence" of a Congressional intent to do so.

Finally, as regards the last prong of the *Cort* test, we note that while one might think that public hearings on local transportation issues would be peculiarly a State and local concern, it is clear that Congress felt that some States and localities were singularly insensitive to ensuring a public voice in these matters. 124 Cong.Rec.

H10995 (1978). The hearing requirement of subsection (3) is conditioned solely upon the receipt of section 5 funds. Inference of a cause of action would in no way impinge upon the States.

Thus we conclude that section 5(i)(3) does confer upon plaintiffs a private right of action.

## IV

■ The Government alleges that the plaintiffs do not have standing to maintain this action. Plaintiffs are riders of the Flushing line. Joseph Fierstein has represented that he rides the Flushing line during the hours when the line is closed down, thus his "injury" is clear. The Federal defendants suggest that Leonard Stavisky has not sustained any injury in fact because he does not allege that he rides the Flushing line during the hours in question.[10] Nevertheless, as a regular rider of that line, he was entitled to express his views on the plan to shut down the line without asserting that he *regularly* rides it during the hours that it would be closed.

We additionally note that plaintiffs are within the "zone of interest" which the statute was designed to protect, *Data Processing Serv. Org. v. Camp*, 397 U.S. 150, 152–53, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970); *see United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Westport Taxi Service, Inc. v. Adams*, 571 F.2d 697 (2d Cir.), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Township of Ridley v. Blanchette*, 421 F.Supp. 435 (E.D.Pa.1976), and thus conclude that plaintiffs do have standing to maintain this action.

---

9. *See Davis v. United AirLines*, 662 F.2d 120 (2d Cir. 1981); *CETA Worker's Org. Comm. v. City of N.Y.*, 617 F.2d 926, 935–36 (2d Cir. 1980) (comprehensive administrative schemes to remedy violations of 29 U.S.C. § 793 and 29 U.S.C. § 816 respectively).

10. In the complaint filed in this action, Assemblyman Stavisky does not allege whether he is bringing this suit in his official capacity, as a New York State legislator, or as an individual. In an affidavit submitted in support of this

motion, he has asserted his representative capacity, apparently as a basis for his standing here. It may be that Assemblyman Stavisky could amend his complaint to set forth a factual basis for affording him standing in his legislative capacity. At this juncture, however, we have treated his complaint as it appears on its face without any assertion of his representative role, as an action brought by him solely as an individual.

## V

Plaintiffs seek a preliminary injunction restraining the local defendants from proceeding with the construction on the Flushing line. In order to succeed on this motion, plaintiffs must show "possible irreparable injury and either (i) probable success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly in the movant's favor." *Dallas Cowboys, etc. v. Pussycat Cinema Ltd.*, 604 F.2d 200, 206–07 (2d Cir. 1979); *Sperry International Trade, Inc. v. Gov't of Israel*, 670 F.2d 8 (2d Cir. 1982); *Whelan v. Colgan*, 602 F.2d 1060 (2d Cir. 1979); *Ives Laboratory Inc. v. Darby Drug Co. Inc.*, 601 F.2d 631 (2d Cir. 1979); *Caulfield v. Bd. of Ed. of the City of New York*, 583 F.2d 605, 610 (2d Cir. 1976); *Keeler v. Joy*, 489 F.Supp. 568 (E.D.N.Y.1980), *aff'd* 641 F.2d 1044 (2d Cir. 1981); *Turof v. Kibbee*, 81 Civ. 768 (E.D.N.Y. April 24, 1981).

 We note at the outset that plaintiffs have not convinced us that the failure to afford them a hearing in this instance constitutes irreparable harm.

In addition, plaintiffs have failed to show either probable success on the merits or sufficiently serious questions and a balance of hardship in their favor. Plaintiffs concede that the defendants have complied with the regulations, Brief for Plaintiffs at 23, in that the service change on the Flushing line affects less than 25% of the number of transit route miles of that route.[11] They argue, however, that the regulation's 25% requirement is both arbitrary and an improper measure of whether a change in service is "substantial." They claim that the 25% requirement is insufficient in that a mere numerical measure of track mileage fails to account for the qualitative changes effected on the entire transit route by a shutdown of service on any portion of that route. They also claim that the 25% requirement is excessive and that a "substantial" change is one which would affect 10% or more of the transit route miles.

At this juncture, it is clear that defendants have conformed to the regulations and that no hearing was required under the circumstances here. If plaintiffs seek to press their challenge as to the reasonableness of the regulations they are of course free to do so. We note, however, that even if they were ultimately successful in showing that the regulations as they exist are arbitrary, and at this point they have presented no evidence to indicate their possible ultimate success, we do not believe that the proper remedy necessarily would be for this Court to rewrite the regulations in such a way as to afford the plaintiffs the right to a hearing.

In light of the foregoing, the plaintiffs' motion for a preliminary injunction must be and hereby is denied. The Federal defendants' motion to dismiss is also hereby denied.

SO ORDERED.

---

11. The Flushing line runs for 9.43 transit route miles. *See* note 4, *supra*.