**CLALLAM COUNTY, et al.,**
**Plaintiffs–Appellees,**

v.

**DEPARTMENT OF TRANSPORTATION,**
**OF the STATE OF WASHINGTON, et al.,**
**Defendants–Appellants.**

**WASHINGTON STATE DEPARTMENT**
**OF TRANSPORTATION,**
**Plaintiff–Appellant,**

v.

**FEDERAL HIGHWAY ADMINISTRA-**
**TION and Ray A. Barnhart,**
**Administrator, Defendants–Appellees.**

No. 85–4124.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 3, 1986.

Decided June 14, 1988.

---

Thomas R. Garlington, Sr. Asst. Atty. Gen., Olympia, Wash., for defendants-appellants.

Mark E. Fortier, Kargianis & Austin, Seattle, Wash., for plaintiffs-appellees.

Before FLETCHER, FERGUSON and REINHARDT, Circuit Judges.

FLETCHER, Circuit Judge:

The Washington State defendants appeal the district court's interlocutory order granting a permanent injunction that prohibits the State from collecting tolls on the Hood Canal Bridge. The State contends that the district court misapplied 23 U.S.C. § 129(a) of the Federal–Aid Highway Act, 23 U.S.C. § 101 *et seq.*, in failing to consider the State's insurance proceeds and interest as "costs of construction." We agree.

## FACTS

The Hood Canal Bridge is a mile-and-a-half long floating bridge linking portions of the upper Olympic peninsula in Washington State. It replaces an earlier bridge that was substantially destroyed in a storm. To finance the original bridge, the State combined its costs with capital costs for the ferry system, issuing bonds worth $30.5 million in 1957. The bonds were refunded in 1961. The new bonds were forty-year term bonds maturing in 2002. The State charged tolls on the bridge, and used the revenue for bridge maintenance and operation costs, including insurance premiums, with most of any remaining net revenue used to pay the principal and interest on the bonds. In accordance with bond covenants, the State insured the bridge and provided that any insurance proceeds to

compensate for physical damage to the bridge would be expended either to reconstruct the bridge or to retire outstanding bonds.

On February 13, 1979, high tides and hurricane force winds destroyed the western half of the bridge. The State received $30.5 million in insurance proceeds for the damage. The Federal Highway Administration (FHWA) awarded the State federal emergency relief funds to reconstruct the bridge. To reduce the federal government's contribution, the State agreed to transfer the insurance proceeds to the FHWA. Pursuant to 23 U.S.C. § 129(a), FHWA and the State executed a "129(a) agreement" authorizing the State to collect tolls on the reconstructed bridge until the State recovered approximately $8 million in outstanding costs from the original bridge (the cost of the original bridge less tolls collected) and $30.5 million in insurance proceeds, plus interest. In October 1982, the State reopened the Hood Canal Bridge as a toll bridge.

After various proceedings in state and federal court,[1] plaintiffs filed this action in federal court against Washington State, the Washington State Department of Transportation (WSDOT), the Secretary of WSDOT, and FHWA seeking injunctive and declaratory relief and damages. Plaintiffs filed a motion for partial summary judgment in which they alleged that the 129(a) agreement violated 23 U.S.C. §§ 129(a) and 301, in that the State was prohibited from collecting tolls to recover the amount of the insurance proceeds that had been transferred to FHWA by the State. The State and FHWA filed cross-motions for summary judgment. After a

hearing, the district court granted the plaintiffs' motion and permanently enjoined the State from collecting additional tolls on the Hood Canal Bridge. The court determined that the state's "costs of construction" consisted of the $8 million in unrecovered costs from the original bridge, but not the $30.5 million in insurance proceeds plus interest, and that inclusion of the latter in the State's "costs of construction" violated 23 U.S.C. §§ 129 and 301. The State timely appeals.[2]

## DISCUSSION

### I. Eleventh Amendment

Plaintiffs brought this suit against the State, WSDOT, the Secretary of WSDOT, and FHWA seeking injunctive and declaratory relief and damages. Upon plaintiffs' motion, the district court granted a permanent injunction against the State defendants. We must consider whether the eleventh amendment bars plaintiffs' action against the State defendants, even though the issue was not raised in the district court. *Edelman v. Jordan,* 415 U.S. 651, 677–78, 94 S.Ct. 1347, 1362–63, 39 L.Ed.2d 662 (1974).

As a general rule, the eleventh amendment prohibits actions against a state or state agency in federal court. *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed. 2d 171 (1985); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 97–99, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1984); *Doe v. Maher,* 793 F.2d 1470, 1493 (9th Cir.1986). Eleventh amendment immunity is waived, however, if (1) the state expressly waives its general immunity to

---

1. Plaintiffs originally filed a state court action against Washington State and the Washington State Department of Transportation, challenging the State's authority to continue collecting tolls on the bridge. After the State defendants moved to join FHWA as a party, the plaintiffs added FHWA as a defendant. FHWA then removed the action to federal court. The district court dismissed the case and remanded it to state court on the ground that the state court lacked jurisdiction over the federal defendant. The state court determined that the action should not be dismissed from state court even though FHWA could not be sued in state court

because the FHWA was not an indispensable party. When FHWA announced that it had changed its position on the amount of interest recoverable through tolls, the State defendants renewed their motion to join the FHWA as an indispensable party. On its own motion, the state court granted a stay of the state action to allow the plaintiffs to refile in federal court where FHWA could be made a party.

2. FHWA also filed a timely notice of appeal, but later filed a stipulated dismissal of its notice.

suit in federal court; (2) Congress expresses its intent to abrogate states' immunity pursuant to section 5 of the fourteenth amendment[3]; or (3) the act manifests a clear intent to condition a state's receipt of federal benefits on the state's waiver of its immunity. *Maher*, 793 F.2d at 1494. We conclude that the eleventh amendment bars suit against the State and the state agency in federal court.

Neither the State nor the agency waived the eleventh amendment immunity. Although counsel for the defendants including the State made representations to the state court indicating a willingness to proceed in federal court and argued to the federal court, in support of a stay, that plaintiffs, if successful on the merits, would be protected because the State would agree to refund tolls collected during the pendency of the litigation, it is unclear whether these statements constituted a waiver of immunity, *see Vargas v. Trainor*, 508 F.2d 485 (7th Cir.1974), *cert. denied*, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975), or rather were simply a recognition that the suit could proceed in federal court against the department head. In light of this ambiguity, we do not find a waiver "unequivocally expressed." *Pennhurst*, 465 U.S. at 99, 104 S.Ct. at 907. Further, Congress has not expressed an intent to abrogate state immunity, nor does Title 23 condition receipt of highway funds on a state's waiver. Because we find no basis for holding that immunity was waived, suit against the State of Washington and WSDOT is barred by the eleventh amendment.

■ The eleventh amendment, however, does not preclude suit against a state official in federal court if the relief sought is prospective, *Green v. Mansour*, 474 U.S. 64, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985); *Edelman*, 415 U.S. at 664, 94 S.Ct.

at 1356, because, when a violation occurs, relief is "necessary to vindicate the federal interest in assuring the supremacy of that law." *Green*, 106 S.Ct. at 426 (citations omitted). Even though there may be fiscal effects on the state treasury incident to a prospective remedy, this fact does not reconstruct the barrier of eleventh amendment immunity against prospective orders necessary to effect compliance with federal law. *Almond High School v. United States Dept. of Agriculture*, 768 F.2d 1030, 1034 (9th Cir.1985). Thus, the eleventh amendment does not bar plaintiffs' action against the state official for prospective injunctive and declaratory relief but would bar an award of damages.

## II. Private Right of Action

■ At oral argument, we requested supplemental briefing addressing the issue of whether plaintiffs have a private right of action. Having fully considered the parties' arguments, we conclude that 42 U.S.C. § 1983 provides an express right of action to enforce 23 U.S.C. § 301.[4]

The Supreme Court in *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), recognized that individuals have an express cause of action under section 1983 against state officials for deprivation of rights, privileges and immunities secured by federal statutes. In *Middlesex County Sewerage Auth. v. National Sea Clammers Assoc.*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (*Sea Clammers*), the Court identified two exceptions to the availability of section 1983 to redress violations of federal law:

(i) [where] Congress had foreclosed private enforcement of [the] statute in the enactment itself, and (ii) [where] the statute at issue ... was the kind that [did

---

**3.** Because we conclude *infra* that Congress has not expressed in Title 23, an intent to abrogate state sovereign immunity, we need not reach the question of whether Congress has the power under the Commerce Clause to abrogate states' eleventh amendment immunity. *Cf. United States v. Union Gas Co.*, 832 F.2d 1343 (3rd Cir.1987) (concluding that Congress does have such power under the Commerce Clause).

**4.** We therefore need not consider whether 23 U.S.C. §§ 301 and 129(a) provide an implied right of action, nor whether the Administrative Procedure Act, 5 U.S.C. § 702, applies. *See Middlesex County Sewerage Auth. v. National Sea Clammers Assoc.*, 453 U.S. 1, 19, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1980).

not create] enforceable "rights" under § 1983.

*Sea Clammers,* 453 U.S. at 19, 101 S.Ct. at 2626. Neither of the exceptions identified in *Sea Clammers* bars an express cause of action under section 1983.

Plaintiffs' contention that they are entitled to be free from tolls arises from the general proscription of section 301.[5] Section 129(a) creates an exception to section 301 and can be raised as a defense to an action claiming a violation of section 301. Section 301, then, would provide the predicate right, if any, giving rise to an action under section 1983. That the government defends on the basis that the exception applies does not change the analysis. We therefore consider whether plaintiffs have a private right of action to enforce section 301.

The State properly does not argue that the first exception applies. Congress has not provided a comprehensive scheme to enforce section 301, *see Sea Clammers,* 453 U.S. at 13–14, 20, 101 S.Ct. at 2622–23, 2626; *Keaukaha–Panaewa Community Ass'n v. Hawaiian Homes,* 739 F.2d 1467, 1471 (9th Cir.1984); indeed, Congress has provided no express remedy under Title 23. We therefore conclude that the first *Sea Clammers* exception does not bar a private right of action under section 1983.

The second exception—whether the statute was the kind that did not create enforceable rights—seems tautological. Our court, however, has interpreted the requirement as similar to the "specially benefited class" prong of *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which establishes guidelines for determining whether a statute provides an implied private cause of action. *See, e.g., Coos Bay Care Center v. Oregon, Dept. of Human Resources,* 803 F.2d 1060, 1062–63 (9th Cir.

1986). A critical inquiry is whether Congress mandated an entitlement or merely encouraged certain activity. *Wright v. City of Roanoke Redev. & Hous. Auth.,* 479 U.S. 418, 107 S.Ct. 766, 770–71, 93 L.Ed.2d 781 (1987); *Keaukaha–Panaewa,* 739 F.2d at 1471 (citing *Pennhurst State School & Hosp. v. Halderman,* 451 U.S. 1, 18, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981)). We must also determine whether plaintiffs are members of a particular class that Congress intended to benefit. *Coos Bay,* 803 F.2d at 1063.

The language of section 301 mandates that federally funded bridges have a particular attribute—that they be toll free. In determining whether this section creates enforceable rights, we find our recent decision in *Coos Bay,* 803 F.2d at 1063, instructive. In *Coos Bay,* we held that healthcare providers and individual Medicaid recipients may stand as co-plaintiffs to assert a cause of action under section 1983 to enforce section 1902(a)(13)(A) of the Social Security Act, 42 U.S.C. § 1396a(a)(13)(A), because they have "parallel interests with respect to Medicaid funding and reimbursement." *Id.* Similarly, users of federally funded bridges have an obvious financial interest in toll-free bridges and are the primary beneficiaries of section 301. The purpose of maintaining toll-free bridges is to aid bridge users, by providing free access across waterways like Hood Canal. *See Cohen v. Massachusetts Bay Transp. Auth.,* 647 F.2d 209, 212 (1st Cir.1981) (court held transit riders were particularly benefited by informed decisionmaking required by the Urban Mass Transportation Act of 1964 mandating transportation authority to give Secretary of Transportation assurances that no substantial service changes would be made without public hearing).[6] The fact that the class of users

---

**5.** Section 301: "Except as provided in section 129 of this title with respect to certain toll bridges and toll tunnels, all highways constructed under the provisions of this title shall be free from tolls of all kinds." The term "highway" includes bridges. *See* 23 U.S.C. § 101(a).

**6.** *Rapid Transit Advocates, Inc. v. Southern California Rapid Transit District,* 752 F.2d 373, 377–78 (9th Cir.1985) cites and distinguishes this

case on its facts. In *Rapid Transit,* our court held that local residents and mass transit users were not particularly benefited by a provision of the Urban Mass Transportation Act of 1964 that states that the purpose of the Act is to encourage the establishment of mass transit systems nor a provision requiring each grant application to certify that the applicant has considered the economic and social effects of the project and its impact on the environment and

is large does not prevent the class from appropriately being considered "specially benefited." *Id.* In this case, the class of bridge users is readily identifiable. We conclude that plaintiffs are members of a class granted enforceable rights. Because neither of the *Sea Clammers* exceptions applies, plaintiffs may assert a private right of action under section 1983 to enforce section 301.

### III. The 129(a) Agreement

We afford considerable deference to an agency's [7] interpretation of the statute it administers. *Hawaiian Elec. Co. v. United States Environmental Protection Agency,* 723 F.2d 1440, 1470 (9th Cir.1984). Judicial deference, however, does not displace judicial analysis, and we must reject agency interpretations "that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Securities Indus. Assoc. v. Board of Governors of the Fed. Reserve Sys.,* 468 U.S. 137, 143, 104 S.Ct. 2979, 2982, 82 L.Ed.2d 107 (1984) (citations omitted). We will otherwise uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Section 301 sets forth a general congressional policy that federally funded highways and bridges "shall be free from tolls of all kinds." 23 U.S.C. § .301. Excluded from the mandate of section 301, however, are "certain toll bridges" as provided in section 129(a). *Id.* Under section 129(a), when a state combines its own funds with federal funds to build a toll bridge, the state may charge tolls up to the amount necessary to recoup the state's contribution toward "costs of construction." [8]

FHWA & WSDOT interpreted section 129(a) as allowing the State to exact tolls to recover a sum equal to the insurance proceeds it contributed and interest, and executed a "129(a) agreement" consistent with their interpretation. The agencies' interpretation is in accordance with the law, and their action is not otherwise arbitrary, capricious, or an abuse of discretion.

The plain meaning of section 129(a), *see Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) ("[u]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary common meaning"), permits a state to charge tolls to repay a state for its "costs of construction." The statutory language does not restrict the source of funding on which a state may draw in providing its contribution. Nor does the legislative history, which reflects the congressional policy of encouraging states, rather than private enterprises, to build bridges even hint at such a restriction. H.Rep. No. 2109, 69th Cong., 2d Sess. 3 (1927).[9] To

---

has found the project consistent with official plans for the comprehensive development of the urban area.

**7.** This suit involves the coordinated action of a federal agency and a state agency. The standard of review of agency action for either is essentially the same. Because their interpretation of the statute, with one exception which has been resolved, is the same, we will consider their action together.

**8.** Section 129(a) provides in relevant part:
(a) Notwithstanding the provisions of section 301 of this title, the Secretary may permit Federal participation ... in the construction of any toll bridge ... upon compliance with the conditions contained in this section. Such bridge ... must be publicly owned and operated.... The State highway department or departments must be a party or parties to an agreement with the Secretary whereby it or they undertake performance of the following obligations:

(1) all tolls received from the operation of the bridge ... less the actual cost of such operation and maintenance, shall be applied to the repayment to the State or other public authority of all of the costs of construction or acquisition of such bridge ..., except that part which was contributed by the United States;
(2) no tolls shall be charged for the use of such bridge ... after the State or other public authority shall have been so repaid; and
(3) after the date of final repayment, the bridge ... shall be maintained or operated as a free bridge....

**9.** "[W]ith the growth of the automobile industry and the general improvement in the Highways of the country and the increase in transportation of persons and property by bus and truck, there is a general demand for the construction of bridges over the waterways of the country and avoiding the delays and the damages that are incident to anticipated ferry sys-

limit a state's source of funding would necessarily impede or prevent some states from participating in the federal program, thereby frustrating, rather than enhancing congressional policy. Accordingly, if the State is the source of funds that have been applied toward the cost of constructing the bridge, section 129(a) permits the State to charge tolls to recoup the amount contributed and expended.

Plaintiffs, however, argue that 23 C.F.R. § 668.105(d) [10] creates an exception to this analysis. Plaintiffs argue that because section 668.105(d) prohibits federal emergency funds from duplicating insurance proceeds, the state's "contribution" does not include such proceeds. The purpose of section 668.105(d) is to preserve federal emergency funds, when a state has ready access to funds. The section simply does not speak to the allocation of costs between the State and bridge users under section 129(a).

Plaintiffs further contend, however, that if permitted to charge tolls, the State would receive a windfall by entitling it to both the reconstructed bridge and the insurance proceeds. But this "windfall" was precisely the result intended by Congress in authorizing the collection of tolls. Under section 129(a), any state contributing a share of the "costs of construction" may recoup the amount it contributes toward building a bridge, and still enjoy ownership of the bridge.[11]

In this case, the plaintiffs urge that the State was a mere conduit through which the insurance proceeds passed, and that the State did not have title to them. We disagree. The State was owner of the insur-

ance policy and paid premiums on it. When the bridge collapsed, the State received the proceeds as beneficiary. Apart from the obligations in the bond indenture to use $8 million to pay off the bonds if it did not rebuild the bridge, once the funds entered the State Treasury, the State could have applied them to any number of projects. That the State chose to request federal emergency aid and contribute the total proceeds toward reconstructing the Hood Canal Bridge did not divest the State of title.

The history whereby the State became entitled to the insurance proceeds is informative. The first Hood Canal Bridge was constructed exclusively from non-federal funds and was not subject to restraints on toll collecting. During the years between the completion of the bridge and its destruction in 1979, the State collected many millions of dollars in tolls. The State owned the bridge, a valuable revenue-producing asset. Upon the bridge's collapse, insurance proceeds were substituted for the bridge itself. Like the bridge, the insurance proceeds were a capital asset of the State. It was this capital that the State expended toward reconstruction of the bridge.

In order to collect tolls pursuant to section 129(a), the State must have expended its own funds in reconstructing the bridge. The State meets this prong of the test handily. The State transferred nearly $30 million in cash to FHWA to reimburse FHWA for its outlay of federal emergency funds to construct the bridge and assumed responsibility for directly paying $11.6 million to complete construction.[12] We con-

tems. But so long as the States or the counties can not use any of the Federal–Aid funds allotted to them either for the construction of toll bridges or for the construction of roads leading to or from toll bridges, the States and counties will not themselves construct bridges, but will leave such improvements to be made by private capital...."
H.Rep.No. 2109, 69th Cong., 2d Sess. 3 (1927).

10. 23 C.F.R. § 668.105(d) implements 23 U.S.C. § 125, which authorizes federal emergency funds. The federal contribution to rebuild the Hood Canal Bridge came from § 125 funds.

11. Plaintiffs' additional assertion that the State is prohibited from using revenues it collects from tolls to fund the ferry system is without merit. Section 129(a) limits the amount of toll revenue a state may collect, but does not dictate how the state may use the revenue once collected.

12. According to an FHWA directive, in which the State acquiesces, some of the combined $41.6 million includes "excess interest" owned by the United States. In calculating the State's contribution toward the "costs of construction," the district court should consider the amount of insurance proceeds plus any interest that the

clude that the State expended the insurance proceeds and interest as "costs of construction" for purposes of section 129(a).

## CONCLUSION

Because the State had title to the insurance proceeds and interest and expended them toward reconstructing the bridge, we conclude that these funds should be considered "costs of construction" contributed by the State toward rebuilding the Hood Canal Bridge. Accordingly, we reverse and remand to the district court for further proceedings.

State would have earned had the proceeds been applied immediately to the reconstruction costs, but not any additional interest that may have accrued.